761 F.2d 1
 18 Fed. R. Evid. Serv. 40
 UNITED STATES of America, Appellee,
v.
Nicolas BELTRAN a/k/a Nicolas Beltran Ramos, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Ernesto Sabulon PARRALES-LUCAS, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Alberto ANGULO-HERNANDEZ, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Nestor BURGOS-SALAS, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Jose Vincente CABARCAS-MENDOZA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Gustavo HERNANDEZ-CORREA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Andres MARTINEZ-APARICIO GONZALEZ, a/k/a Andres F.
Martinez-Gonzalez, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Delmiro NAVARRO-GUZMAN, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Eduardo Jose ORTIZ-CASTILLO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Julio Cesar CORTESANO-GALLARDO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Hernando DE JESUS-FLOREZ, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Casmiro DIAZ-CASTILLO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Juan ELLES-MARTINEZ, Defendant, Appellant.
 Nos. 84-1608, 84-1954 to 84-1965.
 United States Court of Appeals,
First Circuit.
 Heard Feb. 7, 1985.
Decided April 24, 1985.
 
 Russell Hilliard and Susan Denenberg, Concord, N.H., for defendant, appellant.
 Bruce E. Kenna, U.S. Atty., Concord, N.H., for appellee.
 Before BREYER and TORRUELLA, Circuit Judges, and PETTINE,* Senior District Judge.
 TORRUELLA, Circuit Judge.
 
 
 1
 This is a consolidated appeal on behalf of thirteen defendants who were the crew of the Panamanian-registered vessel LICHFIELD I. After a jury trial, all thirteen defendants were found guilty of one count of possession of a controlled substance with intent to import it into the United States, 21 U.S.C. Sec. 955a(d). Additionally, nine of them were found guilty of one count of conspiracy to import a controlled substance into the United States, 21 U.S.C. Sec. 955c.
 
 The facts of the case are as follows:
 
 2
 On the morning of March 12, 1984, the United States Coast Guard dispatched Lt. Commander Elliot from its Cape Cod Naval Air Station to locate a ship suspected of carrying contraband drugs. The order was received through the Coast Guard's New York operations center which provided a last known position for the suspect vessel. Elliot located the vessel approximately forty miles north and slightly west of the position first noted by the intelligence sources. Elliot's plane made only one pass at the ship, during which he photographed it and visually noted that it was a whitehulled "coastal freighter," approximately 180 feet in overall length, and that it appeared to be riding low in the water. He also noted the name LICHFIELD I painted on both bow and stern sections. From the heading, approximate speed, sea conditions, and the position at which the ship was located when sighted, Elliot estimated that it was headed for the Gulf of Maine. Based upon his own observations and the details revealed by the photographs which were developed when he returned to base, Elliot phoned the New York operations staff and briefed them on what he had found.
 
 
 3
 On March 14, 1984, Elliot again flew out to locate the LICHFIELD I. This time he found the vessel about 100 miles further out to sea, corroborating intelligence information that it had been "spooked" by his previous flight.
 
 
 4
 That same day, at about 7:40 PM, the United States Coast Guard cutter ACTIVE, having been ordered to intercept the ship, spotted the vessel about 100 miles northeast of Bermuda. The ACTIVE approached the freighter from the west, and during the course of the evening circled the vessel in order to view it from all sides. The officer in charge of the ACTIVE, Lt. Hammond, observed many details that fit the profile of vessels used to carry contraband.[1] Drawing to within 300 feet of the ship, Hammond proceeded to attempt radio contact with the LICHFIELD I. He also tried alternatively to communicate with said vessel by the use of a signal light, by Morse Code, by international flags, and by loudhailer. He tried flashing the searchlight and sounding the fog horn, but all attempts to attract the LICHFIELD I's attention were unsuccessful.
 
 
 5
 On the morning of March 15, 1984, Hammond once again attempted to contact the vessel's crew. Finally sighting a crewman, Hammond indicated that he wished to make radio contact. Finding the answers to his boarding questions suspicious,[2] Hammond asked the captain of the LICHFIELD I for consent to board the vessel. The request was denied. At about noon the same day, the ACTIVE was informed that pursuant to a diplomatic request, the government of Panama had authorized the Coast Guard to board and search the vessel.
 
 
 6
 Immediately upon boarding, Hammond and Ensign Philbin detected a strong odor of marihuana. Upon entering the "communications room" Hammond noted that the top chart contained an erased track line which led to the northern Georges Bank area of the Gulf of Maine, an area predominantly within the jurisdiction of the United States.[3] Other charts showed more specific details of the United States coast line. Upon touring the ship, the officers noticed that the marihuana odor was coming from the hold. Further investigation revealed plastic sheeting lining the deck of hold # 3, with a brown, leafy substance sprinkled about. In hold # 2 they discovered large burlap sacks, which later proved to contain marihuana.
 
 
 7
 Hammond radioed the ACTIVE for permission to seize the vessel and arrest the crew. The government of Panama stating no objection, the LICHFIELD I was seized at 8:30 PM on March 15, 1984.
 
 
 8
 Hammond, through his interpreter, informed Parrales-Lucas, the person with whom he had originally communicated on the radio, that the vessel was being seized and the crew arrested for attempting to smuggle drugs into the United States.
 
 
 9
 Due to bad weather and mechanical problems, the voyage to the Coast Guard Station at New Castle, New Hampshire lasted six days. During the trip, no statements were taken from any of the LICHFIELD I crew-members. Arriving in port at 1:00 PM on March 21, 1984, the crew was taken into custody by Immigration and Naturalization Service agents for processing. About two and a half hours later, their custody was transferred to the Marshal's Service for transport to Concord. The booking procedure was delayed another hour, while Drug Enforcement Administration Agent St. Hilaire waited for the arrival of an interpreter. Dr. Victoria Richart, the interpreter, whose services were obtained through the New Hampshire State Department of Education, arrived at the Marshal's office at about 5:30 PM. As a result of the questioning through the interpreter, statements were obtained from all thirteen defendants.[4] The total processing took less than six hours. The following morning, they were taken to the courthouse at 8:00 AM for interviews with the Probation Officers in preparation for a 10:00 AM appearance before the Magistrate.
 
 
 10
 * Appellants allege that the Government failed to prove beyond a reasonable doubt by sufficient evidence as to each and every defendant the commission of the substantive offense, 21 U.S.C. Sec. 955a(d), and conspiracy to commit that offense.
 
 
 11
 The test for determining whether there is sufficient evidence to support a guilty verdict is: whether considering the evidence as a whole, when taken in the light most favorable to the Government together with all legitimate inferences that can be drawn therefrom, a rational trier of fact could have found guilt beyond a reasonable doubt. See United States v. Hensel, 699 F.2d 18, 33 (1st Cir.) cert. denied 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983); United States v. Patterson, 644 F.2d 890, 893 (1st Cir.1981). As is frequently the case in prosecutions of this nature, the Government must rely heavily upon circumstantial evidence and the inferences which spring from it to meet its burden. The Government need not exclude every reasonable hypothesis inconsistent with guilt with respect to each piece of circumstantial evidence. Rather, the question is whether the total evidence, including reasonable inferences, is sufficient to support a jury finding that each defendant is guilty beyond a reasonable doubt. United States v. Patterson, supra, 644 F.2d at 893; United States v. Smith, 680 F.2d 255 (1st Cir.1982), cert. denied 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983).
 
 
 12
 To establish a violation of Section 955a(d) on the part of each defendant, the Government was required to prove that the particular defendant under consideration possessed a controlled substance, either actually or constructively, either alone or with others, and that he knew or intended that the controlled substance be unlawfully imported into the United States. The Government had to establish that, with knowledge that a controlled substance was on the ship for purposes of importation into the United States, the particular defendant willfully "associated himself with the venture, in that he participated in it as something he wished to bring about, that he sought by his actions to make it succeed." United States v. Campa, 679 F.2d 1006, 1010 (1st Cir.1982); United States v. Martinez, 479 F.2d 824, 829 (1st Cir.1973). A violation of Section 955c may be established if the Government proves, beyond a reasonable doubt, that a conspiracy to unlawfully possess a controlled substance with intent to import did exist and that the individual in question did knowingly and willfully join that conspiracy intending to make it succeed.
 
 
 13
 Other circuit courts, considering "mere presence" defenses similar to those before us, have held that a reasonable inference of knowing participation in a conspiracy or venture to illegally import a controlled substance by crewmembers of a vessel can be supported by such factors as the length of the voyage, the amount of marihuana on board, and the necessarily close relationship of the crew. See United States v. Michelena-Orovio, 702 F.2d 496 (5th Cir.1983); United States v. Martinez, 700 F.2d 1358 (11th Cir.1983); United States v. Alfrey, 620 F.2d 551 (5th Cir.), cert. denied, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980).
 
 
 14
 This Circuit has also considered contentions similar to those made by these appellants. In United States v. Smith, 680 F.2d 255 (1st Cir.1982), a defendant who had traveled several thousand miles on a boat in close proximity to the rest of the crew and the illegal cargo argued that he was merely a bystander. We rejected the argument, ruling that the jury was entitled to conclude that conspirators engaged in conduct which, by its nature is kept a secret from outsiders, would reasonably not allow the presence of innocent bystanders in their midst while conducting a lengthy, illegal operation. We have generally followed this position, one which is supported by reason and common sense, as well as the law. See, e.g., United States v. Lopez, 709 F.2d 742 (1st Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 187, 78 L.Ed.2d 166 (1983) and United States v. Quejada-Zurique, 708 F.2d 857 (1st Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983).
 
 
 15
 In the case at bar, the juries[5] were presented with considerable circumstantial evidence which was acceptable to rebut the "mere presence" or "bystander" defenses. The crew had been aboard the LICHFIELD I for over three weeks prior to its seizure. From the time it left Columbia until it was boarded by Coast Guard officers, it made no stops. When seized, it contained over 22 tons of marihuana. As a 160-feet coastal freighter, it was traveling a much longer and more circuitous route than normal for that type of ship, particularly considering its alleged destination, and was carrying many extra drums of fuel. The size of the crew was larger than required to operate the ship. Necessarily, the crewmembers shared a close relationship in the cramped quarters on board. The charts on board were marked with track lines leading to an area used as a popular offload site for drugs to be smuggled into the United States.[6] Coast Guard officers testified that the odor of marihuana was detectable throughout the vessel. The keys to the hold in which the marihuana was kept were apparently accessible to the crew. Lastly, none of the crewmembers responded to ACTIVE's various and varied communication attempts, thus indicating a conscious effort to avoid what could otherwise be considered a normal maritime procedure. We find that the record contains sufficient evidence to support the juries' verdicts of guilty as to all of the defendants.
 
 II
 
 16
 Appellants further allege that the court improperly admitted statements made by them during the processing, upon their arrival in New Hampshire. They argue that the statements should have been suppressed because there was an unreasonable delay in bringing the defendants before a magistrate, that the statements were obtained in violation of their Miranda rights, and, that the statements constituted inadmissible hearsay. We disagree.
 
 
 17
 Title 18 U.S.C. Sec. 3501(c) provides in part that a confession made by a defendant while he is under arrest or in custody:
 
 
 18
 [S]hall not be inadmissible solely because of delay in bringing such person before a magistrate ... if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: Provided, that the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.
 
 
 19
 (Emphasis added). The factors to be considered by the trial judge in determining the issue of voluntariness are set forth in 18 U.S.C. Sec. 3501(b):
 
 
 20
 The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.
 
 
 21
 The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.
 
 
 22
 We are presented with a situation where the delay between the arrest and the first appearance before the magistrate was almost seven days. Six of those days were spent at sea, the voyage being protracted by bad weather and mechanical problems. Appellants reasonably have not challenged this part of the delay. What is questioned is the almost 24 hours' delay between the ship's arrival at New Castle at about noon on March 21st and the initial appearance before the magistrate at 10:00 AM the following day, considering that the trip to Concord took only about one hour.
 
 
 23
 The determination of reasonable delay in Section 3501(c) provides for consideration of transportation and distance. While unavailability of a magistrate could be a consideration, the Government has not presented this allegation. Instead, it contends that the time spent in "processing" defendants by the Immigration and Naturalization Service and the Drug Enforcement Administration Agency, and an additional night in the New Hampshire State Prison was reasonable. We disagree.
 
 
 24
 While it was certainly important to process the defendants, given the situation of their six days under arrest at sea, we find that the exigencies of the law required the various law enforcement agencies to give top priority to bringing the crewmen before a magistrate at the first possible moment. Since no valid reason is given by the government for the twenty-odd hours' delay after arrival at New Castle, we must conclude that the delay was unreasonable.
 
 
 25
 Given the facts of the case, however, it does not automatically follow that the failure to suppress the statements given by defendants during the said delay constitutes reversible error.
 
 
 26
 A lapse of time between arrest and initial appearance, standing alone, does not require the exclusion of a statement made during this period. See United States v. Rubio, 709 F.2d 146, 153 (2d Cir.1983). "It is not the lapse of time, but the use of time, ... to employ the condemned psychologically coercive or third degree practices [of interrogators, which is proscribed]." Id. quoting from United States v. Marrero, 450 F.2d 373, 376 (2d Cir.1971). The record shows that the processing by INS lasted about three hours altogether, or fifteen minutes per defendant. The DEA processing required about six hours, or less than one-half hour per defendant. An additional hour delay was spent waiting for the arrival of the interpreter, a person whose presence, given the fact that the defendants' native language was Spanish, was necessary before the proceedings could continue. The interim periods of time were not used by the various law enforcement agencies for proscribed purposes envisioned by the Supreme Court when it created its exclusionary remedy for violation of the defendant's right to a prompt arraignment. See McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and Mallory v. United States, 354 U.S. 449, 452, 77 S.Ct. 1356, 1358, 1 L.Ed.2d 1479 (1957). Finding no purposeful postponement of the arraignment and no lengthy, hostile or coercive interrogation that prejudiced the appellants, we find that the delay should not warrant suppression of the statements.
 
 
 27
 Appellants argue that their statements were obtained in violation of their Miranda rights. Under the "totality of the circumstances" test when applied to the facts of the case we find that each defendants' waiver was knowingly intelligent and voluntary. See Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).
 
 
 28
 At the time of arrest in the high seas, the ostensible captain, Parrales-Lucas, was given his Miranda rights in Spanish. He acknowledged that he understood them. In addition to the crew's collective acknowledgment of their understanding of their Miranda rights, Lt. Hammond obtained individual acknowledgments. Furthermore, each of them was presented with a Miranda rights' waiver form in the Spanish language, upon which they individually signed affirmation of having read and understood their rights. Upon arrival in Concord, prior to the booking process, they were again individually informed of their rights in Spanish. The translator testified that each seemed to understand his rights.[7] After the authorities sought and received basic biographical information from them, the defendants were again reminded that they need not answer any more questions. These facts lead us to conclude that any statement given by defendants occurred after receiving the appropriate warnings under Miranda.
 
 
 29
 Appellants additionally contend that the statements constitute hearsay evidence, improperly admitted, in that the testimony consisted of DEA Agent St. Hilaire's recollection of what the interpreter reported defendants' statements to be. The hearsay question arises because St. Hilaire could testify only to what the interpreter said the defendants had stated.
 
 
 30
 The trial court found that the proffered testimony was admissible under two exceptions to the hearsay exclusion rule: The business records exception, Fed.R.Evid. 803(6) and the apparent trustworthiness exception, Fed.R.Evid. 803(24).
 
 
 31
 We question the trial court's evaluation on this issue.[8]
 
 
 32
 We find the statements more properly characterized as statements by the defendants. Although modern case authority dealing with this issue is sparse, the prevailing view is that the translator is normally to be viewed as an agent of the defendant. United States v. DaSilva, 725 F.2d 828 (2d Cir.1983).[9] Therefore, the translation may be considered an admission by the defendant, which is technically not hearsay. Rule 801(d)(2) provides:
 
 
 33
 A statement is not hearsay if--
 
 
 34
 * * *
 
 
 35
 (2) The statement is offered against a party and is ... (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship....
 
 
 36
 Likewise, 4 J. Weinstein & M. Berger, Weinstein's Evidence p 801(d)(2)(c) at 801-218 n. 34 (1984) states that:
 
 
 37
 [p]rovided that the interpreter has a sufficient capacity, and there is no motive to misrepresent, the interpreter is treated as the agent of the party, and the statement is admitted as an admission unless circumstances are present which would negate the presumption of agency.
 
 
 38
 Dr. Richart, a native speaker of both English and Spanish, testified that she had no problem communicating with any of the defendants and that she did not believe they had any problem in comprehending her translations. The fact that the interpreter took no notes and remembered neither the specific questions nor answers is not crucial, because the notes were being taken simultaneously by St. Hilaire. Inaccuracies or incompleteness of his notes, recollection, or observations would go towards evaluation of his credibility, rather than admissibility.
 
 
 39
 The trial court committed no error in admitting these statements.
 
 III
 
 40
 Defendant Julio Cortesano-Gallardo appeared in the district court on May 29, 1984 intending to enter a guilty plea to Count I. That court refused to accept the plea because Cortesano-Gallardo recanted his earlier admissions of complicity. The plea having been refused, he and his counsel were required to draw a jury on that same date, the trial being scheduled for the following week.
 
 
 41
 The court, having severed the trials of the "second offenders" from "first offenders," explained to Cortesano-Gallardo that the reason for the severance was to prevent a prejudicial "spillover" effect to the "first offenders" from evidence regarding convictions or bad acts of the others. The defendant, being in the category of "first offenders," participated in the drawing of the jury that would not hear evidence on prior acts of the "second offenders."[10]
 
 
 42
 The following week Cortesano-Gallardo's counsel informed the court that her client wished to cross-examine certain witnesses about other co-defendants' prior convictions and bad acts. Upon reflection, the court realized that the defendant's counsel would create the very problem that the severance was designed to prevent. At this point, even Cortesano-Gallardo's counsel questioned her right to switch juries, since she had already cast her lot, so to speak, with the "first offenders" by participating in the selection of their jury. The court, therefore, refused Cortesano-Gallardo's request to switch juries[11] or cross-examine witnesses on the matters in issue. Cortesano-Gallardo was ultimately found guilty by the jury he chose.
 
 
 43
 Impeachment by evidence of conviction of a crime is generally governed by Federal Rule of Evidence 609(a):
 
 
 44
 For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant....
 
 
 45
 (Emphasis added).
 
 
 46
 Defendant Parrales-Lucas had prior convictions for marihuana smuggling. Defendant Burgos-Salas had been deported for drug related offenses. The other "second offenders" had similar prior arrests and convictions.[12] The district court severed the trials of "first offenders" specifically because it believed the prejudicial effect of evidence associating them with known, experienced drug smugglers would greatly outweigh any benefit of impeached credibility. Trial courts are granted broad discretion to determine the scope and extent of cross-examination. Niziolek v. Ashe, 694 F.2d 282 (1st Cir.1982); United States v. Honneus, 508 F.2d 566, 572 (1st Cir.1974), cert. denied, 421 U.S. 948, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975). Likewise, the district court's ultimate determination in weighing the probative value of evidence of bad conduct or prior convictions with its prejudicial effect is reviewed on appeal only for abuse of discretion. See United States v. Gonsalves, 668 F.2d 73 (1st Cir.1982). Finding that Cortesano-Gallardo was not prevented from cross-examining the witnesses, but merely from impeaching their credibility with this particular line of questioning, we find that the trial court did not abuse its discretion.
 
 IV
 
 47
 Cortesano-Gallardo next claims that he did not know of the presence of any drugs on the ship until after it departed, and once he learned of the drugs, he did not join in any conspiracy due, in part, to his incapacitating sea sickness. Thus, the core of his defense was, in the first instance, lack of knowledge, and finally, that he was merely present on the vessel, not having participated in the conspiracy.
 
 
 48
 The court in its instructions specifically addressed the concept of "knowledge" and "knowingly." Likewise, the court instructed that "mere presence [of a defendant at the scene of a crime] does not necessarily establish proof of the existence of a conspiracy."
 
 
 49
 The court's instructions adequately addressed the points of Cortesano-Gallardo's theory of defense. The refusal to give a particular instruction is not subject to objection if the charge given adequately covers the theory of defense. United States v. Morris, 700 F.2d 427, 433 (1st Cir.1983); United States v. Skinner, 667 F.2d 1306, 1310 (9th Cir.1982). The court need not give instructions in the precise form or language requested by the defendant. Morris, supra, 700 F.2d at 433; United States v. Winter, 663 F.2d 1120, 1146 (1st Cir.1981). Viewed as a whole, we find that the court's instructions were adequate and that no error was committed. If that is the case, and the record could support a finding beyond a reasonable doubt of defendant's knowledge and participation in the conspiracy, as it does, the jury was entitled to so find. See United States v. Smith, supra.
 
 V
 
 50
 Appellant Cortesano-Gallardo, as part of his defense, relied on his inability to join the conspiracy, having become seasick for the remainder of voyage, after being at sea for two days. It was his intention to call a physician as an expert witness to testify to the debilitating effects of seasickness. The trial court denied his motion to obtain fees for such a witness. Appellant, therefore, claims he was denied the right to present a defense. We disagree.
 
 
 51
 Given the facts that (1) the Government stipulated to the fact that Cortesano-Gallardo had been seasick on the voyage, (2) the Government's own witness testified to his physical condition when they boarded the boat, and (3) that the physician whom Cortesano-Gallardo intended to call had never examined him and, therefore, could not testify on the effects of seasickness on this particular individual, the court's denial of the motion was not unreasonable. Federal Rule of Evidence 403 provides that, "although relevant, evidence may be excluded if its probative value is substantially outweighed by ... considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See United States v. Sorrentino, 726 F.2d 876 (1st Cir.1984). We endorse the general rule that a trial court's rulings on relevance and admissibility will not be disturbed unless there is abuse of discretion. Id. Given the situation here, we cannot say that the court abused its discretion or that there was prejudice to the appellant's defense of seasickness.
 
 
 52
 For the above stated reasons, the decision of the district court is affirmed.
 
 
 
 *
 Of the District of Rhode Island, sitting by designation
 
 
 [1]
 Lt. Hammond stated that, in addition to the extra fuel barrels topside, there was a false water line on the hull, which was unevenly painted and wearing off. The vessel was in an extremely dirty, rusty and oily condition. There were black tire marks on the sides of the vessel and the topside vents were covered. The ship was flying no flag
 
 
 [2]
 According to his testimony, Hammond was told that the vessel was en route to Canada to pick up a load of fish and that it was empty at the time. As he explained in later testimony, coastal freighters usually stay near the coast, involved in a two-way trade, delivering cargo to a place and picking up another for the return trip. In this case, the LICHFIELD I was empty, allegedly on its way to pick up a load of fish in Newfoundland, Canada. Also, from the heading of the vessel, Hammond did not believe that it was actually traveling toward Newfoundland
 
 
 [3]
 That this jurisdiction exists is demonstrated, for example, in our many decisions dealing with environmental impact on this area. See, e.g., Commonwealth of Massachusetts v. Watt, 716 F.2d 946 (1st Cir.1983); Grazing Fields Farm v. Goldschmidt, 626 F.2d 1068 (1st Cir.1980); Conservation Law Foundation of New England v. Andrus, 623 F.2d 712 (1st Cir.1979)
 
 
 [4]
 Facts and argument related to the Miranda warnings given upon arrest and prior to questioning will be discussed below
 
 
 [5]
 Prior to trial, the court severed the trial of seven defendants from that of the other six, who had some form of prior conviction or prior bad act for similar offenses. It was the court's intent to avoid a "spill-over" from evidence of these acts which the Government planned to submit. In granting the severance, the court ordered that the two separate juries would sit simultaneously and hear evidence admissible to both together. When the Government sought to introduce evidence of prior arrests or bad acts, the court would excuse both juries and recall only the jury drawn for the "second offenders."
 
 
 [6]
 In United States v. Marsh, 747 F.2d 14 (1st Cir.1984), a case the facts of which closely parallel the one at bar, we found said facts sufficient to prove that defendants knew beyond a reasonable doubt that the destination of the contraband was the United States
 
 
 [7]
 Appellants argue that the interpreter had no prior experience assisting law enforcement personnel in giving Miranda rights to arrested persons. While this may be correct, we do not find the task so complicated as to require any particular skill or experience other than fluency in both languages
 
 
 [8]
 The so-called business records exception provides in pertinent part as follows:
 Records of regularly conducted activity.
 A memorandum, report, record, or data compilation in any form of acts, events, condition, or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity.
 Federal Rule of Evidence 803(6) (emphasis added). The situation here reflects no regularly kept record whatsoever. What we have is the testimony of an agent based upon his informal notes taken during interviews with the defendants conducted through a translator. Likewise, Rule 803(24) provides that "a statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness" will be admitted, other requisites being present. We do not find here, however, the level of trustworthiness necessary, considering that we are dealing with the recollection of what each of thirteen individual defendants said.
 
 
 [9]
 In DaSilva, as in the case at bar, the interpreter's services were obtained by the DEA interviewer
 
 
 [10]
 Cortesano-Gallardo's counsel orally joined the motion for severance from the "second offenders," at the May 29th hearing
 
 
 [11]
 Cortesano-Gallardo's counsel objects to the court's refusal to allow her client to change juries, four days into the trial, toward the close of the Government's case. Appellant cites neither law nor jurisprudence to support a claim that he should have been permitted to do so. Finding that this request was made in order to admit the same type of evidence he would have brought in on cross examination, we believe that the discussion which follows will suffice on both points
 
 
 [12]
 Prior bad acts and arrest not resulting in convictions would be considered excluded under Rule 403 which states, that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ..."