918 F.2d 979
 1991 A.M.C. 719
 UNITED STATES of America, Appellee,
v.
Emiro Miguel PASSOS-PATERNINA, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Orlando ESPINOSA-SANCHEZ, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Jose Gilberto AREVALO-NAVARRO, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Oscar ESTUPINAN-PAREDES, Defendant, Appellant.
UNITED STATES of America, Appellee,
v.
Ricardo ESTUPINAN-PAREDES, Defendant, Appellant.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 12, 1990.
Decided Oct. 24, 1990.
 
 Judith Berkan, Santurce, P.R., by Appointment of the Court, for defendant, appellant Oscar Estupinan-Paredes.
 Enrique Velez-Rodriguez, Hato Rey, P.R., by Appointment of the Court, for defendant, appellant Jose Gilberto Arevalo-Navarro.
 Thomas R. Lincoln, San Juan, P.R., by Appointment of the Court, for defendant, appellant Emiro Miguel Passos-Paternina.
 Armando Rivera Carretero, Hato Rey, P.R., by Appointment of the Court, on brief, for defendant, appellant Orlando Espinosa-Sanchez.
 Lydia Lizarribar-Masini, Old San Juan, P.R., by Appointment of the Court, on brief, for defendant, appellant Ricardo Estupinan-Paredes.
 Jose R. Gaztambide, Asst. U.S. Atty., with whom Daniel F. Lopez-Romo, U.S. Atty., Hato Rey, P.R., was on brief, for the U.S.
 Before SELYA, ALDRICH and CYR, Circuit Judges.
 CYR, Circuit Judge.
 
 
 1
 The five defendants were discovered in highly incriminating proximity to a half ton of cocaine aboard the vessel SHEME on the high seas off Puerto Rico a few months before they were tried and convicted under the Maritime Drug Law Enforcement Act. Their appeals raise a surfeit of issues fathoming the sufficiency of the evidence and the fairness of their trials. As we see no insufficiency and no unfairness, we affirm their convictions.
 
 
 2
 * The night of September 3, 1988 was dark and stormy as United States Coast Guard Cutter NUNIVAK went about a routine patrol of the Caribbean waters in and around the Virgin Islands.[1] Several miles south of the island of St. John, a lookout on the NUNIVAK sighted the lights of a vessel some seven miles distant. As the NUNIVAK approached, the lights of the other vessel could no longer be seen, though radar contact was maintained except when obstructed by rising swells in the worsening storm. Approximately forty minutes later the NUNIVAK's searchlight serendipitously illuminated a flagless vessel, her stern bearing the name SHEME but no homeport designation. NUNIVAK attempted radio contact in Spanish and English, but no response penetrated the stormy ether. Instead, the SHEME changed course and began criss-crossing NUNIVAK's bow, nearly occasioning a collision.
 
 
 3
 Finally, the voice of SHEME's master was heard over NUNIVAK's radio: "Llamando el barco Americano"--"Calling the American ship." Lieutenant Donovan, deck watch officer aboard the NUNIVAK, asked for the official name of the vessel, its last port of call, its next port of call, the number of persons on board, and the type of cargo. The master responded that SHEME's last port of call had been Barranquilla, Colombia, five persons were on board, all Colombian citizens, and that SHEME carried no cargo, as she was en route to Tortola, in the British Virgin Islands, for sale to a new owner. When Lt. Donovan requested SHEME's registration number, the master responded that he was not its owner and would not be able to provide the registration number until he contacted his agent in Colombia the next morning. The master refused to consent to boarding. Lt. Donovan testified that at some point during their radio communications the master stated that the SHEME was a Colombian vessel.
 
 
 4
 Around midnight the NUNIVAK received permission from Coast Guard headquarters in San Juan to board the SHEME without its consent. The SHEME refused to respond to Lt. Donovan's entreaties to heave to so as to permit a safe boarding in the stormy seas. The NUNIVAK sounded general quarters, manned its guns, and fired across SHEME's bow. The SHEME hove to.
 
 
 5
 Prior to the boarding, Lt. Donovan instructed SHEME to muster all personnel at her stern. The master stated that SHEME was a Panamanian vessel, again advising that he did not consent to the boarding and wished to contact his agent in Barranquilla in the morning.
 
 
 6
 The Coast Guardsmen proceeded to board. As Lt. Donovan and five armed seamen came over the gunwales, SHEME's crew was nowhere to be seen. As the boarding party cautiously began to explore the vessel, they came upon four crew members in the cabin wiping copious quantities of grease from their bodies. There were two flags--Colombian and Panamanian--in the cabin. The master was in the pilothouse, near the radio. The master presented Lt. Donovan with an expired Panamanian vessel registration, giving Barranquilla as its homeport, and papers identifying each crew member as a Colombian citizen.
 
 
 7
 A preliminary search disclosed no contraband. The vessel was shipshape throughout, except for the grease-covered inspection plates on the fresh-water drinking tanks. The boarding party proceeded to open one of the inspection plates and found that the tanks were filled with water. While removing the plate, however, the Coast Guardsmen noticed another inspection plate, previously overlooked, located on a bulkhead originally believed to be the inner wall of the SHEME's transom. The plate was heavily laden with grease, several bolts were loose and several were missing. The removal of the inspection plate exposed a hidden storage compartment, containing nearly four hundred styrofoam containers wrapped in green tape; some had been opened and emptied. The white crystalline contents from one package field-tested as cocaine. Later chemical analysis indicated that the entire cocaine cargo consisted of 386.2 kilograms of 94 percent pure cocaine.
 
 II
 
 8
 A. "Vessel Subject to the Jurisdiction of the United States "
 
 
 9
 It is unlawful for any person "on board a vessel subject to the jurisdiction of the United States ... to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C.App. Sec. 1903(a). It is an essential element of the offense criminalized under section 1903(a) that the vessel be shown to have been "subject to the jurisdiction of the United States." United States v. Maynard, 888 F.2d 918, 926 (1st Cir.1989). A "vessel subject to the jurisdiction of the United States" includes:
 
 
 10
 (A) a vessel without nationality;[2](B) a vessel assimilated to a vessel without nationality, in accordance with paragraph (2) of article 6 of the 1958 Convention on the High Seas;
 
 
 11
 ....
 
 
 12
 46 U.S.C.App. Sec. 1903(c)(1).
 
 
 13
 As SHEME was not "a vessel without nationality" under section 1903(c)(1)(A), we consider whether there was sufficient evidence adduced to demonstrate that she was a "vessel assimilated to a vessel without nationality," within the meaning of 46 U.S.C.App. Sec. 1903(c)(1)(B) and article 6, p 2 of the 1958 Convention on the High Seas. The 1958 Convention on the High Seas, to which section 1903(c)(1)(B) refers, provides that "[a] ship which sails under the flags of two or more States, using them according to convenience, may not claim any of the nationalities in question with respect to any other State, and may be assimilated to a vessel without nationality." Convention on the High Seas, art. 6(2), opened for signature April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200.
 
 
 14
 Although we are presented with an issue of first impression in this Circuit, on several occasions the Eleventh Circuit construed former 21 U.S.C. Sec. 955a, the predecessor to section 1903. See, e.g., United States v. Marino-Garcia, 679 F.2d 1373, 1378 n. 3 (11th Cir.1982) ("A vessel will be deemed stateless where it sails under the authority of two or more States and uses them according to convenience."), cert. denied sub nom. Pauth Arzuza v. United States, 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983); United States v. Batista, 731 F.2d 765, 767 (11th Cir.1984) ("A vessel which sails under the authority of two or more states, and uses them according to convenience, such as in this case flying one flag and claiming nationality under another, will be deemed a stateless vessel."); United States v. Matute, 767 F.2d 1511, 1513 (11th Cir.1985) (crew's use of Colombian flag and Venezuelan registration papers, held "precisely" what statute and article 6 of Convention on High Seas contemplated); United States v. Gonzalez, 810 F.2d 1538, 1542 (11th Cir.1987) (where master made claim of Honduran registry, but boarding party located Colombian registration papers on vessel, held: vessel "stateless").
 
 
 15
 The vessel SOMAPE IV was considered "stateless," United States v. Ayarza-Garcia, 819 F.2d 1043 (11th Cir.), cert. denied, 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987), in circumstances very similar to the present. The Coast Guard initiated contact with SOMAPE IV through a cardboard loudhailer. There was conflicting evidence as to whether SOMAPE IV had made a claim of Colombian registry or, as appellants urged, merely asserted that the crew was Colombian. A search of the vessel disclosed Panamanian registration papers. The Eleventh Circuit viewed the evidence in the light most favorable to the government and concluded that SOMAPE IV was "assimilated to a vessel without nationality." Id. at 1047-48.
 
 
 16
 In United States v. Potes, 880 F.2d 1475, 1480 n. 3 (1st Cir.1989) (quoting Ayarza-Garcia, supra ), we intimated receptivity to construing article 6(2) of the 1958 Convention on the High Seas in this fashion; we now make our position explicit. We agree with the Eleventh Circuit that the clear purport of article 6(2) of the 1958 Convention on the High Seas requires that a vessel which sails under the authority of two or more nations be considered "assimilated to a vessel without nationality." Furthermore, in the circumstances of the present case, we hold that the conflicting verbal claims of nationality, and the presence of two flags in the cabin, were tantamount to sailing under the authority of more than one nation according to convenience.
 
 
 17
 Under the current statute, a claim of nationality or registry results from:
 
 
 18
 (A) possession on board the vessel and production of documents evidencing the vessel's nationality in accordance with article 5 of the 1958 Convention on the High Seas;
 
 
 19
 (B) flying its nation's ensign or flag; or(C) a verbal claim of nationality or registry by the master or person in charge of the vessel.
 
 
 20
 46 U.S.C.App. Sec. 1903(c)(3). SHEME's master's verbal claims of Colombian and Panamanian registry constituted conflicting claims of nationality under section 1903(c)(3)(C), and the master's presentation of SHEME's Panamanian vessel registration represented a second claim of Panamanian registry under section 1903(c)(3)(A).
 
 
 21
 The defendants challenge Lt. Donovan's testimony that a claim of Colombian registration was made during NUNIVAK's first radio contact with SHEME. On cross-examination, Lt. Donovan testified:
 
 
 22
 Q: So before you board you have this information.
 
 
 23
 A. I'm not sure I follow you. Which information?
 
 
 24
 Q. That it is a Panamanian vessel?
 
 
 25
 A. Yes sir. He did tell us that afterwards. But originally he told us he was Colombian. Then he told us he was Panamanian. So that was a conflicting story.
 
 
 26
 So we wrote that down, but I had no idea what to think because he originally said he was Colombian, now he said he was Panamanian.
 
 
 27
 The defendants correctly note that Lt. Donovan, during direct examination, made no mention of a verbal claim of Colombian registry by SHEME's master.
 
 
 28
 We resolve issues of credibility in favor of the verdict, United States v. Winter, 663 F.2d 1120, 1127 (1st Cir.1981), cert. denied sub nom. Goldenberg v. United States, 460 U.S. 1011, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983), and we likewise resolve conflicting interpretations of the evidence in favor of the verdict, United States v. Cintolo, 818 F.2d 980, 983 (1st Cir.), cert. denied, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987); United States v. Rivera-Sola, 713 F.2d 866, 869 (1st Cir.1983). Cf. Ayarza-Garcia, 819 F.2d at 1047 ("the jury is free to choose among alternative reasonable constructions of the evidence"). The evidence need not preclude every hypothesis inconsistent with the jury verdict. United States v. Cuevas-Esquivel, 905 F.2d 510, 514 (1st Cir.1990); United States v. Guerrero Guerrero, 776 F.2d 1071, 1075 (1st Cir.1985), cert. denied sub nom. Mosquera v. United States, 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986).
 
 
 29
 There is no question that Lt. Donovan's testimony, viewed as favoring the verdict, provided sufficient basis for a jury determination that SHEME asserted a verbal claim of Colombian registry. Although defendants insist that Lt. Donovan must have mistaken the master's statements that SHEME's homeport was Barranquilla, Colombia, as a claim of Colombian registry, Donovan's testimony does not support their interpretation. Moreover, defense counsel had ample opportunity to delve into these matters at trial, but chose not to do so.
 
 
 30
 Set in context--with the presentation of SHEME's Panamanian registration papers, the verbal claim of Panamanian registry, the presence of a Colombian flag and a Panamanian flag on board, and the master's protestations against providing SHEME's registration number--Lt. Donovan's testimony that SHEME asserted a verbal claim of Colombian registry seems considerably less incongruous than defendants' contrary contention. We conclude that there was sufficient evidence on which the jury could determine, beyond a reasonable doubt, that SHEME was a stateless vessel.
 
 B. "Homeport" Instruction
 
 31
 Three defendants contend that the district court committed reversible error by rejecting the following jury instruction:
 
 
 32
 For purpose [sic] of determining whether one nationality was claimed or whether inconsistent claims of nationality were made, you should bear in mind that a claim of homeport is not the equivalent of a claim of nationality. That is, a vessel can claim one nationality in country "A" and a homeport in country "B" and this does not constitute an inconsistent claim of nationality. Homeport is not the equivalent to [sic] nationality.
 
 
 33
 The defendants argue that the jury could not have understood the crucial evidentiary issue raised by their defense without an instruction on the distinction between a vessel's homeport and its nationality.
 
 
 34
 The defendants were entitled to proper jury instructions on any theory of defense for which there was a sufficient evidentiary predicate. United States v. Gibson, 726 F.2d 869, 874 (1st Cir.), cert. denied, 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984). Of course, there is no requirement that the trial court instruct the jury in the precise form and language requested. "[I]f the instructions as given are correct and cover the issues of the case," we will not disturb the judgment. United States v. Fusaro, 708 F.2d 17, 22 (1st Cir.), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). We will reverse a conviction only if the rejected instruction (1) represented a correct statement of the applicable law; (2) "was not substantially covered in the charge actually delivered to the jury;" and (3) was essential to the effective presentation of the particular defense. See Gibson, 726 F.2d at 874 (quoting United States v. Grissom, 645 F.2d 461, 464 (5th Cir.1981)). Accord United States v. Morris, 700 F.2d 427, 433 (1st Cir.), cert. denied sub nom. Graham v. United States, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983).
 
 
 35
 We are constrained to conclude that the jury charge in this case, viewed as a whole, Cintolo, 818 F.2d at 1003; United States v. Beltran, 761 F.2d 1, 11 (1st Cir.1985), substantially covered the requested instruction. The jury was instructed that "inconsistent claims of nationality render the vessel assimilated to a vessel without nationality" and that a "claim of nationality or registry includes only possession and production of ... nationality documents, flying the nation's flag, or a verbal claim of nationality." (emphasis added). Thus, the court provided the jury with the barebones legal framework for determining whether SHEME was a "stateless vessel." Moreover, during trial the defendants relentlessly elicited testimony contrasting SHEME's "homeport" and its "nationality." The district court was not required to comment on specific conflicts in the evidence, particularly those which were so thoroughly explored by the parties at trial. Instead, the court instructed the jury how to approach credibility determinations and how to resolve conflicts in the evidence. Thus, the jury had the necessary tools with which to undertake its consideration of the defense theory that Lt. Donovan had misspoken or misunderstood when he testified that the master of SHEME had made a verbal claim of Colombian registry.
 
 
 36
 Even though the proffered instruction was "arguably proper, arguably desirable ..., [s]o long as the trial judge touches all the relevant bases ... he has some discretion to pick and choose at the periphery." Cintolo, 818 F.2d at 1004. The district court's failure to give the precise instruction requested by the defendants did not amount to reversible error.
 
 C. Evidence of Knowledge and Intent
 
 37
 The defendants next contend that there was insufficient evidence of their knowing and intentional possession of a controlled substance with intent to distribute it. See 46 U.S.C.App. Sec. 1903(a); 18 U.S.C. Sec. 2. See also Beltran, 761 F.2d at 6. Although a defendant may be convicted as a principal if he aided and abetted a criminal offense, United States v. Campa, 679 F.2d 1006, 1010 (1st Cir.1982), mere presence aboard the vessel, even with knowledge that a crime is being committed, is insufficient to support a conviction for aiding and abetting the offense, United States v. Quejada-Zurique, 708 F.2d 857, 859 (1st Cir.), cert. denied, 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983).
 
 
 38
 We review all evidence in the light most favorable to the government to determine whether a rational juror could conclude, beyond a reasonable doubt, that each defendant knew there was a controlled substance aboard the SHEME, see Guerrero Guerrero, 776 F.2d at 1074, and intended in some manner to facilitate its distribution, see United States v. Corpus, 882 F.2d 546, 550 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3251, 111 L.Ed.2d 761 (1990). We have examined a number of circumstantial considerations which may lend support to a reasonable inference that a defendant aboard a vessel had knowledge that the cargo included controlled substances: the size of the vessel, e.g., United States v. Robinson, 843 F.2d 1, 8 (1st Cir.), cert. denied, 488 U.S. 834, 109 S.Ct. 93, 102 L.Ed.2d 69 (1988); the condition of the vessel, e.g., Guerrero Guerrero, 776 F.2d at 1075; the number of crew members, e.g., United States v. Molinares Chares, 822 F.2d 1213, 1219 (1st Cir.1987); the relationships among the crew members, e.g., United States v. Lopez, 709 F.2d 742, 746-47 (1st Cir.), cert. denied, 464 U.S. 861, 104 S.Ct. 187, 78 L.Ed.2d 166 (1983); the volume of the contraband, e.g., Corpus, 882 F.2d at 550; the value of the contraband, e.g., Guerrero Guerrero, 776 F.2d at 1074; the accessibility of the contraband, e.g., United States v. Luciano Pacheco, 794 F.2d 7, 11 (1st Cir.1986); the odorousness of the contraband cargo, e.g., Beltran, 761 F.2d at 7; the length of the voyage, e.g., id. at 6-7.
 
 
 39
 We defer, within reason, to inferences formulated by the jury in the light of its collective understanding of human behavior in the circumstances revealed by the evidence. See, e.g., Robinson, 843 F.2d at 8; cf. Guerrero Guerrero, 776 F.2d at 1075 (deference due jurors, who reflect "common-sense view of the community"); United States v. Smith, 680 F.2d 255, 259 (1st Cir.1982), cert. denied, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983). The circumstances aboard the SHEME were shown to include: (1) a shipshape vessel about seventy feet in length, with five crew members, including the captain, on a four day voyage; (2) a cargo of cocaine having great monetary value, secreted in a hidden storage compartment in 400 taped containers, some of which had been opened and emptied prior to a boarding which followed an extended chase at sea; (3) the master's conflicting verbal claims of registry and denial of any knowledge of the vessel's registration number; (4) the presence of the flags of two nations on board a vessel which was flying no flag; (5) the vessel's sophisticated electronic equipment; (6) the expired Panamanian vessel registration and the absence of a valid vessel registration on board a vessel en route to a distant port for sale to a new owner; and (7) the master's refusal to permit boarding, initial failure to heave to, and failure to muster the crew on deck as directed prior to the boarding.
 
 
 40
 The jury could draw several eminently reasonable inferences in these circumstances. First, it is extremely unlikely that a vessel with a cargo of contraband worth millions of dollars would be entrusted to a captain who was unaware of the nature of the cargo. See Guerrero Guerrero, 776 F.2d at 1074. Second, from the SHEME's erratic maneuvering, the dousing of its running lights as the NUNIVAK drew near, and its master's refusal to grant permission to board, the jury could not escape the inference that the master sought to avoid detection of SHEME's cargo by the authorities. Third, the inconsistent claims of nationality, the absence of valid documentation, and the master's repeated statements that he did not know the vessel's registration number are difficult to reconcile with the announced purpose of the journey--the delivery of the vessel to a new owner. A jury's skepticism of the master's story could contribute to its determination of the master's guilt. See Smith, 680 F.2d at 260 ("jury could conclude that a knowingly false statement is demonstrative of consciousness of guilt"). Fourth, the sophisticated electronic equipment, the two flags, the false claims of nationality, and the evasive and dilatory maneuvering, all pointed to a careful scheme to avoid detection and to delay boarding by the authorities. Fifth, the fact that the bolts securing the inspection plate leading to the hidden compartment had been loosened, in some instances removed altogether, coupled with the fact that wrenches were discovered in the passageway adjacent to the steerage where the inspection plate was located, would support a reasonable inference that the inspection plate had been recently removed. Some of the taped styrofoam packages had been opened and were empty. It would be reasonable to infer that before any attempt was made to dispose of the illicit cargo at sea, it would be prudent to remove it from the styrofoam containers to prevent flotation. Finally, and most significantly as concerns the defendant crew members, all four crew members were apprehended while in the process of cleaning copious quantities of grease from their bodies, at one o'clock in the morning shortly after NUNIVAK fired across SHEME's bow. The jury would have been hard pressed to overlook the reasonable inference that SHEME's crew was not mustered on deck, as ordered by Lt. Donovan, because they were busy with a more urgent task. The inspection plate concealing the cocaine compartment, and the immediately adjacent water tanks, were heavily laden with grease--so heavily, in fact, that the clothing of the Coast Guard officer who entered the hidden compartment was so badly soiled that it had to be discarded. The inference that the entire crew had been engaged in an effort to conceal or dispose of the cocaine during SHEME's evasive maneuvering is powerfully supported. Cf. Molinares Chares, 822 F.2d at 1219 (paint on clothing matched fresh paint on areas leading to secret cache of marijuana).
 
 
 41
 The circumstantial evidence adduced at trial speaks volumes in vindication of the challenged jury verdicts, which determined in sum that each defendant not only knew the cocaine was on board but intended in some manner to facilitate its distribution. All essential elements of the charged offense were proven beyond a reasonable doubt against each defendant.
 
 D. Denial of Jury View
 
 42
 The final contention is that a new trial is necessary because the district court improperly rejected a defense request to permit the jury to view the SHEME or, in the alternative, to view a videotape of its interior. The defendants further assert that serious prejudice resulted from comments made by the district judge in explaining to the jury that there would be no jury view.
 
 
 43
 The jury view request was made during a recess in the testimony of Lt. Donovan. The district judge deferred a decision, preferring first to conduct a personal inspection of the vessel in the presence of counsel. The jurors were told to dress for a possible jury view on the following day. After inspecting the vessel, the judge denied the request for a jury view, which prompted defense counsel to request an opportunity to prepare a videotape recording that afternoon or over the weekend. The request was summarily denied. Upon their return to the courtroom, the jurors were informed of the vessel inspection.
 
 
 44
 I found the conditions dangerous there. Because of the close quarters, I got a little bit seasick and I don't think that it's proper for me to take you down there. So therefore we are not going to have an inspection, and I believe that the quarters have been sufficiently described by the witnesses that have come before you for you to make up your mind and render a verdict.
 
 
 45
 The federal courts recognize their inherent power to permit a jury view of places or objects outside the courtroom. See generally 1 E. DEVITT & L. BLACKMAR, FEDERAL JURY PRACTICE & INSTRUCTIONS Sec. 5.13 (3d ed. 1977). The decision to permit a view is entrusted to the sound discretion of the trial court. See United States v. Drougas, 748 F.2d 8, 30-31 (1st Cir.1984); United States v. Gallagher, 620 F.2d 797, 801 (10th Cir.), cert. denied, 449 U.S. 878, 101 S.Ct. 224, 66 L.Ed.2d 100 (1980); United States v. Bryant, 563 F.2d 1227, 1230 (5th Cir.1977), cert. denied, 435 U.S. 972, 98 S.Ct. 1616, 56 L.Ed.2d 65 (1978); United States v. Johnson, 767 F.2d 1259, 1273 (8th Cir.1985). We conclude that the decision to deny the request for a jury view due to dangerousness and the availability of sufficient testimonial evidence about the vessel was well within the sound discretion of the district court. Similarly, the district court's denial of a belated request to videotape the SHEME, so near the end of trial, was not an abuse of the district court's discretion in matters relating to the orderly conduct of the trial and the mode of presenting evidence.
 
 
 46
 Finally, the comment the court made about "close quarters," in explaining why the jury would not view the vessel, did not result in significant prejudice to any defendant's case. The potential dangerousness of the vessel to non-seamen, such as the jury, seems to us irrelevant to any material issue in the case. Moreover, the closeness of the ship's quarters was thoroughly described at trial. Finally, the court made clear to the jury that they were the "judges of the facts." Cf. Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1292 (5th Cir.) (explanatory comments only prejudicial when court does not make clear to jurors that they have burden of decision), cert. denied, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974).
 
 III
 
 47
 For the reasons discussed above,[3] the judgments of conviction are affirmed.
 
 
 48
 AFFIRMED.
 
 
 
 [1]
 We limn the relevant circumstances under the standards governing appellate review in criminal cases. See infra pp. 984-985
 
 
 [2]
 The government contends and defendants dispute that SHEME was a "vessel without nationality," within the meaning of section 1903(c)(1)(A) and (B), which includes:
 (A) a vessel aboard which the master or person in charge makes a claim of registry, which claim is denied by the flag nation whose registry is claimed; and
 (B) any vessel aboard which the master or person in charge fails, upon request of an officer of the United States empowered to enforce applicable provisions of United States law, to make a claim of nationality or registration for that vessel.
 46 U.S.C.App. Sec. 1903(c)(2). There is no evidence that any nation denied a claim of registry by the SHEME. Furthermore, there is unequivocal evidence that the SHEME's master did not fail to make a claim of registry at Lt. Donovan's request. Thus, SHEME was not "a vessel without nationality."
 
 
 [3]
 Espinosa-Sanchez argues that he was entitled to a four-point reduction of the base offense level, as a "minimal participant," United States Sentencing Commission, Guidelines Manual, Sec. 3B1.2 (Nov.1987), or a two-point reduction as a "minor participant," Sec. 3B1.2(b). He asserts only that he has been a fisherman or assistant machinist all his life, and that his name appears last on the list of crew members. The district court's refusal to grant the reduction was not clearly erroneous. See United States v. Wright, 873 F.2d 437, 442-44 (1st Cir.1989)