USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1076

 HELEN A. LYNCH,

 Plaintiff, Appellant,

 v.

 CITY OF BOSTON, ET AL.,

 Defendants, Appellees.

No. 98-1112

 HELEN A. LYNCH,

 Plaintiff, Appellee,

 v.

 CITY OF BOSTON, ET AL.,

 Defendants, Appellees,

 KELLEY CRONIN,

 Defendant, Appellant.

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Robert E. Keeton, U.S. District Judge]

 Before

 Stahl, Circuit Judge,
 
 Aldrich and Campbell, Senior Circuit Judges.
 
 
 
 
 Ellen J. Messing with whom James S. Weliky, Messing &
Rudavsky, P.C., Stephen M. Voltz, Nathan & Voltz and Carolyn Koch
were on brief for plaintiff, Helen A. Lynch.
 Kevin S. McDermott with whom Merita A. Hopkins, Corporation
Counsel, Dawna McIntyre, Assistant Corporation Counsel, City of
Boston Law Department, were on brief for City of Boston, et al.
 

June 16, 1999

 CAMPBELL, Senior Circuit Judge. Helen Lynch brought this
action in the district court against the City of Boston and, inter
alia, Kelley Cronin, a City employee. Lynch alleged that Cronin
told her to "clear out your desk" and removed Lynch from her
volunteer position on the Mayor's Hunger Commission in retaliation
for a phone call Lynch made to the Mayor's office during which
Lynch complained that the City's Emergency Shelter Commission
("ESC"), of which Cronin served as the Executive Director, was
under-staffed at a time when homeless persons in the City were in
need of services. Lynch alleged that the statement that she must
"clear out her desk" was tantamount to a refusal by Cronin to renew
her contract of employment as Can Share coordinator and that this
adverse action, along with Lynch's removal from the Hunger
Commission, violated the First Amendment to the United States
Constitution and 42 U.S.C. 1983. Lynch also brought claims under
Massachusetts law, including a claim against Cronin for intentional
interference with her advantageous relations with the City. The
jury answered special verdict questions on Lynch's section 1983 and
intentional interference with advantageous relations claims, and
awarded $40,000 in compensatory damages and $10,000 in punitive
damages against Cronin. The district court entered judgment in
favor of Lynch on the section 1983 and intentional tort claims
against Cronin and in favor of defendants on the remaining claims.
 The parties filed post-judgment motions. The district
court thereupon entered an amended judgment holding (1) that Cronin
was entitled to qualified immunity on Lynch's First Amendment
claim, both as to the allegations concerning her failure to re-hire
Lynch for the 1994 Can Share program and Lynch's removal from the
Mayor's Hunger Commission, (2) that the City was not liable under
42 U.S.C. 1983, (3) that Lynch was entitled to $4,000 in damages
for emotional distress on her intentional tort claim, and (4) that
Lynch would be entitled to $10,000 in punitive damages and $60,000
in attorneys' fees if section 1983 liability were reinstated
against Cronin on appeal. 
 In these consolidated appeals, Lynch challenges the
district court's qualified immunity and municipal liability
rulings, asserts that the district court erred in reducing her
requested attorneys' fees and costs, and seeks a new trial because
of alleged errors in evidentiary rulings and jury instructions. In
her cross-appeal, Cronin asserts that the district court erred in
awarding Lynch $4,000 in emotional distress damages in connection
with her intentional tort claim because Lynch failed to demonstrate
any pecuniary loss, as Cronin asserts is required under
Massachusetts law. 
 For the reasons that follow, we affirm, although on
grounds different from those relied upon by the district court in
its judgment dismissing the section 1983 claims against Cronin and
the City. We conclude that Lynch is not entitled to a new trial. 
Finally, we reverse and vacate the district court's award of
emotional distress damages in connection with Lynch's intentional
tort claim. 
 I. BACKGROUND
 We recite the underlying facts in the light most
favorable to the jury's verdict. See Alvarez-Fonseca v. Pepsi Cola
of Puerto Rico Bottling Co., 152 F.3d 17, 21 (1st Cir. 1998). As
the coordinator of the City's Can Share food drive, Lynch worked as
a seasonal employee of the City of Boston under a series of
contracts beginning in 1987. The purpose of the Can Share program
was to provide food for the homeless and hungry in the Boston area. 
The program was conducted under the auspices of the City's
Emergency Shelter Commission ("ESC"), and took place annually over
the course of several months usually beginning in October and
concluding in December. Each year, Lynch was paid on a weekly
basis while the drive was in progress and, sometimes, during
periods just before and after the drive. During the remainder of
each year, when not on the City's payroll, Lynch typically
performed pre- and post-drive tasks without reimbursement. In
addition to serving as the Can Share coordinator, Lynch had also
been appointed each year since 1986 to serve, on a volunteer basis,
on the Mayor's Hunger Commission, an honorary body formed to
address city-wide hunger issues. 
 In December, 1993, Lynch received a flyer that had been
distributed to all City employees by the newly elected Mayor,
Thomas Menino, in which the Mayor encouraged employees to provide
suggestions to his office for the improvement of City services. On
January 12, 1994, Lynch placed what she intended to be an anonymous
phone call to the Mayor's office. During the phone call, Lynch
complained about a lack of staffing at the ESC that day. 
Unfortunately for Lynch, her call did not remain anonymous. 
Lynch's call was answered by John Greeley, a City employee who was
the husband of defendant Kelley Cronin, Lynch's supervisor at the
Can Share program and the Executive Director of the ESC. Greeley
told Cronin of his conversation with Lynch. Cronin immediately
requested Lynch to come to City Hall for a meeting concerning the
phone call. 
 On January 13, the day after Lynch's telephone call to
the Mayor's office, Lynch met with Cronin at the ESC office. Lynch
was not then on the ESC payroll, having received her last paycheck
in connection with the 1993 Can Share drive in December, 1993. 
Nor, at the time, had she been specifically told she would be re-
hired for the 1994 Can Share drive that was to commence in the fall
of 1994. Cronin was upset that Lynch had complained to the Mayor's
office instead of speaking to her directly. At the conclusion of
the meeting, which was attended only by Lynch and Cronin, Cronin
told Lynch to "clear out your desk." Both Lynch and Cronin
testified that they did not specifically discuss whether Lynch
would be working on the forthcoming 1994 Can Share campaign. After
the meeting, Lynch returned to her desk and continued working on a
letter she had begun drafting.
 Later the same day, Lynch met with Ann Maguire, the
former director of the ESC who had been promoted to director of the
City's Office of Neighborhood Services and Office of Boards and
Commissions, and was responsible in that capacity for overseeing
the ESC. Lynch told Maguire about her earlier meeting with Cronin
and expressed the belief that she had been "fired." Maguire
assured Lynch that she had not been fired, that she need not clear
out her desk, and that she should continue working on the 1993 Can
Share wrap-up tasks. Maguire suggested that Lynch wait a few
months before approaching Cronin about the 1994 Can Share drive,
and assured Lynch that by that time everything would be fine.
 Later on January 13, 1994, Lynch met again with Cronin. 
At this second meeting, Cronin testified that she told Lynch that
she had not been terminated. Cronin told Lynch that she had asked
her to "clear out her desk" because space was needed for a new
full-time employee who was coming to work at the ESC. Cronin also
testified that she told Lynch to clear out the desk because the
1993 Can Share campaign had ended and Lynch no longer needed the
desk. Cronin and Lynch did not specifically discuss whether Lynch
would be working on the 1994 Can Share drive. Lynch testified,
however, that Cronin asked her what she was working on with regard
to Can Share and that the two discussed goals for the 1994 Can
Share drive and various tasks that needed to be performed to meet
those goals. Lynch also testified that Cronin gave her the
"impression" that she (Lynch) would be working on the 1994
campaign. In fact, Lynch testified on cross-examination that she
believed, based upon her meeting with Maguire and this second
meeting with Cronin, that she had a "verbal contract" to work on
the 1994 Can Share drive:
 Q: Is it your contention that you had a
 contract to conduct the 1994 Can Share drive?

 A: Yes.

 Q: And this verbal contract that you allege
 was made was made between you and Kelly Cronin
 on January 13, 1994, the time of your meeting,
 is that true?

 A: Yes.

 Q: And it was that meeting on January 13, 1994
 which formed the basis of your understanding
 or belief of what the contract was, is that
 true?

 A: Yes.

 Q: And you believed that the contract was to
 conduct the 1994 can Share campaign, is that
 true?

 A: Yes. 

 After the second meeting with Cronin, Lynch returned to
her desk. She cleared out the desk and placed her belongings in
boxes, which she left in the cubicle near the desk. Thereafter,
Lynch continued to prepare for the 1994 Can Share drive. She
prepared a budget for the 1994 campaign, and met with a T-shirt
vendor to discuss a possible contract for shirts commemorating the
ten-year anniversary of the Can Share program. At Cronin's
request, Lynch arranged and attended a meeting with the City
comptroller to discuss the budgets for the 1993 and 1994 Can Share
drives. 
 In April, 1994, Cronin reorganized the ESC. As part of
that reorganization, Cronin created a new full-time position known
as "Staff Assistant II." The duties of Staff Assistant II
consisted of the Can Share coordinator duties, as well as other
related anti-hunger duties. In May, 1994, unbeknownst to Lynch,
Cronin hired James Markland for the Staff Assistant II position. 
In May, 1994, Markland asked to meet with Lynch to discuss the 1994
Can Share budget. Lynch testified that it was at this meeting that
she first learned that Markland was working on the 1994 campaign. 
In June, 1994, Cronin told Lynch that she would not be working on
the 1994 Can Share drive as a paid employee, but welcomed her
assistance in a volunteer capacity. Lynch testified that prior to
this, "not a soul" had informed her that she would not be working
on the 1994 Can Share drive. Later, in August, 1994, Cronin
informed Lynch that she had been removed from the Mayor's Hunger
Commission.
 Lynch sued the City, Cronin, Greeley, and Maguire, 
claiming that the decision not to hire her for the 1994 Can Share
drive and her removal from the Hunger Commission were in
retaliation for the January 12, 1994 phone call. In her five-count
complaint, which was filed in state court but subsequently removed,
on the basis of federal question jurisdiction, to federal district
court in Boston, Lynch alleged that the termination of her
relationships with the ESC and the Hunger Commission, along with
the hiring of Markland for the Staff Assistant II position,
violated 42 U.S.C. 1983 and the First Amendment to the United
States Constitution, the Massachusetts Whistleblower Statute (Mass.
Gen. L. c. 149, 185(b)(1) and (b)(3)), and the Massachusetts
Equal Rights Act (Mass. Gen. L. c. 93, 102, 103). Lynch also
brought a state law tort claim in which she alleged that Cronin had
intentionally interfered with her advantageous relations with the
City. 
 The case was submitted to a jury in two phases. At the
conclusion of Phase I, which was devoted to issues of liability,
the jury answered detailed special questions, submitted pursuant to
Fed. R. Civ. P. 49(a). See Lynch v. City of Boston, 989 F. Supp.
275, 302-309 (D. Mass. 1997) (reprinting special verdict form). 
The jury answered several questions in Lynch's favor on her section
1983 claim against Cronin and her tort claim against Cronin for
intentional interference with advantageous relations. 
 The jury found that at the time of the telephone call on
January 12, 1994, Lynch was a former employee of the ESC under one
of a succession of temporary contracts for part-time employment
during part of the year. See id. at 303. The jury also found that
on January 12, 1994, Lynch had a reasonable expectation of
employment for the 1994 Can Share program. Id. at 304. In
instructing Lynch to "clear out her desk," the jury found that
Cronin had acted "with a motive of retaliating for Ms. Lynch's
telephone call of January 12, 1994." Id. In so finding, the jury
rejected as pretextual the non-retaliatory reasons offered by
Cronin for telling Lynch to clear out her desk (the need for desk
space and the end of the 1993 Can Share program). See id. at 304-
05. With regard to the Staff Assistant II position created in May,
however, the jury effectively found that Lynch was not qualified
for the position, and that Cronin had not hired Markland in
retaliation against Lynch for her telephone call. See id. at 306. 
There was no finding or other suggestion that the reorganization
itself was retaliatory. 
 At the conclusion of Phase I, the jury awarded $24,000
in damages for harm to Lynch's reputation because of the non-
renewal of her Can Share contract, $12,000 in damages for injury to
Lynch's reputation as a result of her removal from the Mayor's
Hunger Commission, and $4,000 in emotional distress damages
resulting from Cronin's statement that Lynch should "clear out her
desk." See id. at 308. At the close of Phase II of the trial,
which was devoted solely to determining whether the defendants
should pay punitive damages, the jury found that Cronin had acted
callously and with reckless disregard as to Lynch's First Amendment
rights and awarded Lynch $10,000 in punitive damages. See id. at
309.
 The district court entered judgment for Lynch on the
section 1983 and intentional interference with advantageous
relations claims brought against Cronin, and in favor of defendants
on all remaining counts. Subsequently, Cronin filed a Motion for
Judgment as a Matter of Law or in the Alternative for a New Trial
or Remittitur arguing, inter alia, that she was qualifiedly immune
from Lynch's section 1983 claim. Lynch filed a Motion to Alter or
Amend the Judgment, in which she argued that both the City and
Cronin should be held liable for compensatory damages under section
1983 and that emotional distress damages should be awarded against
Cronin under both the section 1983 claim and the intentional
interference claim. Lynch also filed an Application for Attorneys'
Fees and Costs in which she sought $370,000 in fees and costs as a
prevailing party in a civil rights action. See 42 U.S.C. 1988.
 After considering the parties' submissions, the district
court entered an amended judgment. In its written opinion, the
court identified the violation of Lynch's First Amendment rights as
having occurred on January 13, 1994 when Cronin told Lynch to
"clear out her desk." At that time, the ESC "had yet to be
reorganized . . . [and] . . . a possibility still existed that the
City of Boston would contract with the plaintiff for the 1994 Can
Share season." 989 F. Supp. at 290. The district court rejected
Cronin's argument that Lynch could not then have been discharged
because she was not then an employee. Stressing that the question
was not whether she was discharged, but rather whether an adverse
employment action or decision occurred, the court noted that a
retaliatory non-renewal of contract or failure to re-hire fitted
within that concept. The district court also rejected Cronin's
defense that no adverse employment decision occurred because the
jury found that Lynch's old Can Share position, which was the only
one available in 1994, was incorporated as a duty of the new Staff
Assistant II position, for which Lynch was not qualified. The
court said,
 The fact that the defendants chose to
 reorganize and redefine a job position after
 January 13, 1994 cannot have the retroactive
 effect of shielding the defendant from
 liability for a violation that had already
 occurred [i.e. on January 13]. 

Id. 

 The district court concluded, therefore, that Cronin's
January 13 "clear out your desk" order was a cognizable violation
of Lynch's First Amendment rights. Nevertheless, the court went on
to conclude that Cronin was entitled to qualified immunity with
regard to Lynch's claim that Cronin's refusal to re-hire her for
the 1994 Can Share program violated the First Amendment, and that
the City was not liable under section 1983. See Lynch, 989 F.
Supp. at 285, 289. The district court also ruled that Lynch's
claim for harm to her reputation associated with the loss of her
position on the Hunger Commission was defeated by Cronin's
qualified immunity. See id. at 297. Accordingly, the court
eliminated the jury's award of $24,000 in connection with Lynch's
section 1983 claim based on the non-renewal of Lynch's Can Share
contract, and also eliminated the $12,000 award for harm to Lynch's
reputation caused by her removal from the Hunger Commission. The
court allocated the jury's award of $4,000 for emotional distress
damages to Lynch's intentional interference tort claim. Finally,
the district court entered an alternative amended judgment awarding
Lynch $10,000 in punitive damages and $60,000 in attorneys' fees in
the event the section 1983 claim was reinstated on appeal. 
 In these appeals, the parties ask us to decide (1)
whether Cronin was entitled to qualified immunity with regard to
Lynch's claim that Cronin's refusal to re-hire her for the 1994 Can
Share program and her removal from the Hunger Commission violated
the First Amendment and section 1983, (2) whether the City is
liable under section 1983 for a violation of Lynch's First
Amendment rights, (3) whether, assuming there is liability under
section 1983, the district court erred in capping Lynch's
attorneys' fees and costs in the alternative amended judgment at
$60,000, (4) whether Lynch is entitled to a new trial as a result
of several allegedly erroneous evidentiary rulings made by the
district court and allegedly erroneous jury instructions, (5)
whether, if Lynch's section 1983 claim is not reinstated, she is
nevertheless entitled to the jury's award of $12,000 for loss of
reputation caused by Lynch's removal from the Hunger Commission,
under her state law claim for intentional interference with
advantageous relations, and (6) whether Lynch was entitled, under
Massachusetts law, to the award of $4,000 in emotional distress
damages on her claim of intentional interference with advantageous
relations. 
 II. DISCUSSION
 We will proceed first with the various issues raised by
Lynch in her appeal. We will then turn to the sole issue raised in
Cronin's cross-appeal: whether the district court erred in
awarding $4,000 in emotional distress damages in connection with 
the intentional interference with advantageous relations tort
claim. 
A. Section 1983 Liability and Qualified Immunity
 After it received the jury's special verdict form, the
district court granted judgment as a matter of law pursuant to Fed.
R. Civ. P. 50(b) in favor of Cronin on Lynch's section 1983 claim
on the ground that Cronin was qualifiedly immune from suit. We
review the district court's decision de novo, taking the facts in
the light most favorable to Lynch. See Tang v. Rhode Island, 163
F.3d 7, 11 (1st Cir. 1998). 
 We need not reach the issue of qualified immunity,
however, unless Lynch has demonstrated conduct that rises to the
level of a constitutional violation. See Siegert v. Gilley, 500
U.S. 226, 232 (1991); see also Sacramento v. Lewis, 523 U.S. 833,
118 S. Ct. 1708, 1714 n. 5 (1998). Lynch's First Amendment claim
against Cronin rests on her contentions that she was (1) not re-
hired for the 1994 Can Share program and (2)removed from the Hunger
Commission in retaliation for her phone call to the Mayor's office
on January 12, 1994. Thus, we first examine whether Lynch has
shown any cognizable First Amendment injury at all with regard to
Cronin's failure to re-hire her for the 1994 Can Share campaign.
 In the usual case, a plaintiff who claims to have been
terminated or not re-hired for retaliatory reasons has an existing
employment relationship with her employer at the time of the
adverse employment decision. See Perry v. Sindermann, 408 U.S.
593, 597 (1972) (non-tenured professor cannot be discharged in
retaliation for protected speech); Rankin v. McPherson, 483 U.S.
378, 383 (1987) (probationary employee working for employer at time
of discharge); Cheveras Pacheco v. Rivera Gonzalez, 809 F.2d 125,
129 (1st Cir. 1987) (transitory employee with ongoing employment
relationship). Here, the jury found that on January 13 Lynch was
a former employee but one with a reasonable expectation of future
employment. The district court rejected Cronin's argument, which
she presses again on appeal, that a mere former employee has no
rights under the First Amendment in this situation. The court
concluded, in effect, that Lynch's reasonable expectancy that in
1994 she would again be hired to coordinate the Can Share drive
could not be cast aside in retaliation for her protected speech,
under the doctrine announced in Perry v. Sindermann and progeny. 
 We may assume, although we need not decide, that the
district court was correct in its conclusion that Lynch's
expectation of being re-hired was a valuable governmental benefit
that could not be denied in retaliation for protected speech. See
Perry v. Sindermann, 408 U.S. at 597. But even if the First
Amendment shielded Lynch from not being re-hired by the City of
Boston because of what she had said on the telephone on January 12,
Lynch must still demonstrate that the adverse employment action,
i.e. the refusal to re-hire, actually occurred on January 13. The
jury did find that Cronin's "clear out your desk" statement, made
on that date, was in retaliation for Lynch's critical phone call to
the Mayor's office. But Lynch has not argued in her appellate
brief, and the district court did not indicate, that it was the
literal use of a desk that was the valuable benefit denied in
violation of First Amendment rights. Rather Cronin's "clear out
your desk" statement is presented both by Lynch and by the district
court as a kind of shorthand method of informing Lynch that the
City of Boston would not re-hire her, as it had in the past, to
coordinate the 1994 Can Share campaign. The district court found
that Lynch had a reasonable expectation of employment by the City
on January 13 and that Cronin's telling her to "clear out her desk"
interfered with that expectation and constituted a violation of
Lynch's First Amendment rights on that date. See Lynch, 989 F.
Supp. at 290, 294; see also id. at 290 (finding that "an adverse
employment action, or decision, in a broader sense, including the
failure to rehire, is what the court must examine"). 
 The determination that Lynch's First Amendment rights had
been violated on January 13, 1994, and not several months later
when she was expressly denied re-employment, is pivotal to the
district court's finding of a section 1983 violation. The jury
found that Lynch was not qualified for the later-created Staff
Assistant II position, and that appointment of another person to
that position was not in retaliation for the January 12 phone call. 
See infra. We therefore review for clear error the district
court's implied supplemental finding that Cronin's "clear out your
desk" statement made during the first of two conversations between
Lynch and Cronin on January 13, 1994, was tantamount to an adverse
employment action on that date, notifying Lynch that she would not
be rehired by the City for the 1994 Can Share post. See Fed. R.
Civ. P. 49(a); Anderson v. Cryovac, Inc., 862 F.2d 910, 916 (1st
Cir. 1988). 
 Our reading of the record indicates that, while Cronin's
"clear out your desk" statement might initially have conveyed such
a message, that interpretation was later dispelled on the same day
as the result of further conversation between Lynch and Cronin. 
Reviewing Lynch's own testimony of what transpired on January 13,
we believe it was clearly erroneous for the district court to infer
that Cronin had communicated to Lynch an adverse employment
decision on that date such as would support the finding of a
constitutional violation. 
 It is undisputed that nothing specific was said
concerning Lynch's re-employment by the 1994 Can Share program
during the first meeting between Lynch and Cronin on January 13,
1994, at which Lynch was told to "clear out her desk." Standing
alone, however, the statement could reasonably have conveyed to
Lynch that she was no longer welcome in the program, hence would
not be re-hired; Lynch, indeed, testified to believing that she had
just been "fired," and so reported to Ann Maguire. But to conclude
that Lynch was advised on that day that the opportunity to work on
the 1994 Can Share drive had been irretrievably withdrawn ignores
the evidence of what next occurred, as well as Lynch's further
testimony concerning her own understanding of her future employment
prospects. 
 After the first meeting with Cronin, Lynch testified she
spoke with Maguire, Lynch's former supervisor who was now in a
position senior to Cronin. Maguire assured Lynch that she had not
been fired. A second meeting then took place on January 13 between
Lynch and Cronin, which, according to Lynch's own testimony, left
her with the "impression" that she would in fact be working on the
1994 Can Share drive. Lynch in fact testified unequivocally that
she had a contract to conduct the 1994 Can Share drive as the
result of her meeting on January 13 with Kelly Cronin. On the very
day of the "clear out your desk" statement, Lynch and Cronin
discussed goals and tasks relating to the 1994 campaign, and Lynch
developed a budget for the 1994 Can Share. Further, at Cronin's
request, Lynch arranged a meeting with the City comptroller to
review the 1993 and 1994 Can Share budgets and attended the
meeting. Lynch testified that "not a soul" informed her that she
would not be working on the 1994 Can Share drive until June, 1994. 
 Hence while Cronin's "clear out your desk" statement
might, in isolation, support the district court's finding that her
rights were then violated (viz., that Cronin had thereby
communicated her unwillingness to re-hire Lynch in retaliation for
her speech the previous day), that conclusion is undermined by
Lynch's own testimony as to how matters were left on the day. The
record clearly demonstrates that following the second meeting
between Lynch and Cronin, neither of the parties continued to
interpret Cronin's "clear out your desk" statement to be tantamount
to a decision not to re-hire Lynch for the 1994 campaign. To the
contrary, Lynch testified she acquired then a "verbal contract" to
be re-hired. Under these circumstances, we do not see how Cronin's
"clear out you desk" statement whatever might initially be made
of it can be equated with Cronin's having made and communicated
a decision on January 13, 1994 not to re-hire Lynch for the next
Can Share drive. We are, therefore, unable to find sufficient
basis in the record for the district court's finding that Lynch's
First Amendment rights were violated on that date. 
 An adverse employment decision was, of course, 
communicated in June, 1994, when Lynch was told that she would not
be re-hired for the 1994 Can Share drive. Cf. Delaware State
College v. Ricks, 449 U.S. 250, 258 (1980) (alleged discrimination
in employment decision occurred for purposes of statute of
limitations at the time the tenure decision was made and
communicated to employee). But, as the district court suggested,
see note 6, supra, the jury effectively found that the refusal to
re-hire on that date did not constitute a First Amendment
violation. In April, 1994, Cronin had reorganized the ESC and had
eliminated Lynch's prior position, assigning those
responsibilities, in addition to several other duties, to James
Markland, who was hired in May, 1994 for the Staff Assistant II
position. As noted, the jury supportably found that Cronin did not
hire Markland in order to retaliate against Lynch for her January
12, 1994 phone call. The jury findings also indicate that Lynch
was not believed to be qualified for the Staff Assistant II
position. Thus, Cronin has demonstrated that she would not have
hired Lynch for the 1994 Can Share drive regardless of her
protected speech. Cf. Mt. Healthy City Sch. Dist. v. Doyle, 429
U.S. 274, 283-84 (1977) (providing that employer in First Amendment
retaliation case is not liable if it establishes that the same
decision would have been made even in the absence of protected
speech). Accordingly, with regard to the portion of Lynch's
section 1983 claim based upon the decision not to re-hire her for
the 1994 Can Share, we conclude that Lynch has failed to
demonstrate any violation of the First Amendment. 
 Lynch's claim based upon the termination of her service
as a volunteer on the Hunger Commission is a somewhat different
matter. There is no dispute that Cronin's decision to terminate
Lynch's service on the Hunger Commission was communicated to Lynch
in August, 1994. We assume, without deciding, that the opportunity
to serve as a volunteer could constitute the type of valuable
governmental benefit or privilege the deprivation of which can
trigger First Amendment scrutiny. See Perry v. Sindermann, 408
U.S. at 597. " The district court ruled that Cronin was entitled to
qualified immunity with regard to this adverse employment action. 
We agree. 
 Government officials have qualified immunity from
personal liability for actions taken while performing discretionary
functions. They "generally are shielded from liability for civil
damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known." Harlow v. Fitzgerald, 457
U.S. 800, 818 (1982). See El Dia, Inc. v. Rosello, 165 F.3d 106,
109 (1st Cir. 1999). If the right the government allegedly
violated was clearly established at the time of the challenged
conduct, "the immunity defense ordinarily should fail, since a
reasonably competent public official should know the law governing
his conduct." Harlow, 457 U.S. at 818-19. The Supreme Court has
held that for a right to be clearly established, 
 [t]he contours of the right must be
 sufficiently clear that a reasonable official
 would understand that what he is doing
 violates that right. This is not to say that
 an official action is protected by qualified
 immunity unless the very action in question
 has previously been held unlawful; but it is
 to say that in the light of pre-existing law
 the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987). 
 It was not "clearly established" as of August, 1994, when
Lynch removed Cronin from the Hunger Commission, that a government
official could not take such action in retaliation for protected
speech. We recognize that the Supreme Court has held that a
variety of public benefits, in addition to public employment,
cannot be denied solely because of the recipient's exercise of
constitutional rights. See, e.g., Rutan v. Republican Party, 497
U.S. 62 (1990) (promotion or transfer in government job); Shapiro
v. Thompson, 394 U.S. 618, 627 n.6 (1969) (welfare benefits). 
Lynch argues that loss of a volunteer position with a government
agency falls into this category. However, neither the Supreme Court
nor this court has ever held that the rule forbidding denial of
valuable governmental benefits in reprisal for protected speech
announced in Perry v. Sindermann and its progeny extends to the
denial of non-compensated positions on voluntary boards. Scant
authority in support of such an extension of the doctrine currently
exists. 
 Lynch relies primarily upon a Ninth Circuit decision in
which the court, applying its own precedents, held that volunteer
status is a valuable governmental privilege that cannot be denied
on the basis of protected speech. See Holland v. Wonder, 972 F.2d
1129, 1135 (9th Cir. 1992). A single decision from another court
of appeals applying its own precedents is plainly insufficient to
meet the requirement "that in the light of pre-existing law the
unlawfulness must be apparent" to a reasonable government official. 
Anderson, 483 U.S. at 640. See also El Dia, 165 F.3d at 110 n.3
(concluding that precedents from outside this circuit may be
relevant, depending upon, inter alia, "the location and level of
the precedent, its date, its persuasive force, and its level of
factual similarity to the facts before this Court"). While, as
said, the opportunity to serve as a volunteer may be a valuable
governmental benefit or privilege within the Perry v. Sindermann
doctrine, we cannot say that the law was "clearly established" in
August, 1994, when Lynch was told by Cronin that she would be
removed from the Hunger Commission, that Lynch had a right to
continue to serve as a volunteer on a government commission that
could not be denied on the basis of constitutionally protected
speech. Accordingly, we affirm the district court's ruling that
Lynch "cannot overcome qualified immunity with respect to her claim
regarding her status on the Hunger Commission." Lynch, 989 F.
Supp. at 297. 
 To summarize, there are two aspects to Lynch's section
1983 claim against Cronin. With regard to the portion of Lynch's
section 1983 claim that is based upon Cronin's refusal to re-hire
Lynch for the 1994 Can Share program, Lynch has failed to
demonstrate a violation of the First Amendment. As to that portion
of the section 1983 claim involving Lynch's removal from the Hunger
Commission, we conclude that Cronin is entitled to qualified
immunity. 
B. Municipal Liability 
 At trial, Lynch claimed that the City was also liable
under section 1983 for the deprivation of her First Amendment
rights caused by Cronin's refusal to re-hire her for the 1994 Can
Share program. In order to prevail under section 1983 against the
City, Lynch must establish that municipal policy or custom caused
a deprivation of federal rights. See Monell v. New York City Dep't
of Social Serv., 436 U.S. 658, 694 (1977). We have concluded,
supra, that no deprivation of Lynch's First Amendment rights
occurred in connection with the refusal by Cronin to re-hire her
for the 1994 Can Share drive. Thus, the City is not liable under
section 1983. 
C. Attorney's Fees
 After the district court entered the original judgment,
Lynch filed an Application for Attorneys' Fees and Costs in which
she sought, pursuant to 42 U.S.C. 1988, a total of $359,664.80 in
fees and $10,159.73 in costs. Section 1988 allows a "prevailing
party" in a civil rights action to recover a "reasonable attorney's
fee." 42 U.S. C. 1988(b). As Lynch did not prevail as to any
aspect of her section 1983 claim, we uphold the district court's
determination that she was not entitled to attorney's fees and
costs. 
D. Alleged Evidentiary Errors and the Whistleblower Claim
 Lynch asserts that the district court made three 
evidentiary rulings that deprived her of a fair trial with regard
to her state law "whistleblower" claim. We review the district
court's evidentiary rulings for abuse of discretion. See Acosta-
Mestre v. Hilton Intern. of Puerto Rico, 156 F.3d 49, 57 (1st Cir.
1998). In the event we discern error, we must determine whether
the error was harmless. "Our inquiry is whether [exclusion or
admission] of the evidence affected plaintiff's substantial
rights." Vincent v. Louis Marx & Co., Inc., 874 F.2d 36, 41 (1st
Cir. 1989). See also Fed. R. Civ. P. 61. "The central question is
whether this court 'can say with fair assurance . . . that the
judgment was not substantially swayed by the error.'" Lubanski v.
Coleco Indus., Inc., 929 F.2d 42, 46 (1st Cir. 1991) (citations
omitted).
 Lynch first assails the district court's refusal to honor
a pretrial stipulation entered into by the parties. The
stipulation purported to allow the authors of letters written by
Lynch's supporters in the community to Mayor Menino that attested
to Lynch's exemplary work as Can Share coordinator to read their
letters to the jury, although the letters themselves were not to be
admitted in evidence and given to the jury. Lynch asserts that the
district court's refusal to honor the parties' stipulation
prevented her from demonstrating to the jury that defendants
failed to hire her for the Staff Assistant II position not because
she was unqualified, but for pretextual reasons.
 The stipulation with respect to the letters was not, as
Lynch asserts, an agreement of the parties as to certain facts that
were not disputed. Nor was it an agreement concerning the
authenticity or admissibility of the letters themselves. Such
agreements are generally favored by trial courts because they
expedite trials. See 22 C. Wright & K. Graham, Federal Practice
and Procedure: Evidence 5194 (1978), at 195 ("Where the effect of
the stipulation is to eliminate the need for proof of a particular
point or debate over the admissibility of certain evidence,
enforcement of the stipulation can . . . be justified in terms of
judicial efficiency."). Rather, the parties proposed to dictate to
the trial court the procedure by which evidence would be presented
to the jury. The district court rejected the parties' stipulation
because, inter alia, it determined that to allow the witnesses to
read the content of the letters verbatim and, thus, effectively
admit their content for all purposes, but not permit the jury to
receive the letters and consider their contents during
deliberations other than by way of the jurors' memories or notes,
would cause undue confusion for the jury. Instead, the district
court ruled that Lynch could offer the letters for admission and
the court would admit or exclude them in accordance with the
Federal Rules of Evidence. The court then heard and rejected
arguments advanced by Lynch as to why the letters should be
admitted in evidence. These rulings as to specific letters'
admissibility were not appealed.
 While the district judge could certainly have allowed the
letters to be read as provided in the stipulation, the manner in
which evidence is received at trial is a matter within the sound
discretion of the trial court. See United States v. Passos-
Paternina, 918 F.2d 979, 986 (1st Cir. 1990) (district court has
discretion "in matters relating to the orderly conduct of the trial
and the mode of presenting evidence"). The district court believed
that to allow each author to read the letter verbatim, but then to
preclude the jury from reviewing the letters during their
deliberations, would needlessly confuse the jury. We are reluctant
to second-guess a determination of this nature, and cannot say that
the district court's decision to reject the parties' stipulated
procedure in favor of a letter-by-letter determination of
admissibility amounted to an abuse of discretion. 
 Lynch's substantial rights were, in any case, unaffected
by the court's ruling. The authors of the letters testified at
trial concerning such matters as Lynch's "phenomenal" networking
skills and their perception that Lynch did "exceptional" work at
Can Share. They conveyed what the letters would have conveyed,
their good opinion of Lynch's qualifications relative to the Staff
Assistant II position. It is difficult to see how rejection of the
stipulated procedure, even were it to have exceeded the court's
discretion, was other than harmless. 
 Next, Lynch asserts that the district court erred when it
precluded Michael Devlin, who had worked extensively with Lynch on
the Can Share program, from answering the following question: "In
the time that you worked in the Can Share program, who would you
say was responsible for the success and growth the program had?" 
Lynch argues that this lay opinion testimony would have supported
her claim under the Massachusetts Whistleblower Statute that she
was qualified for the Staff Assistant II position and was denied
the position for pretextual reasons. The district court precluded
Devlin from rendering his opinion regarding who was responsible for
the growth and success of the Can Share program on the grounds that
(1) Devlin was not "competent" to render the opinion, and (2) Lynch
had failed to persuade the court that the opinion sought pertained
to an "appropriate" subject for opinion testimony by a lay witness. 
 Rule 701 of the Federal Rules of Evidence permits the
rendering of lay opinion testimony when such testimony is (a)
"rationally based upon the perception of the witness," and (b)
"helpful to a clear understanding of the witness' testimony or the
determination of a fact in issue." 
 Here Devlin's opinion would have cleared the first
hurdle, that the opinion was based on the personal perception of
the witness. See, e.g., United States v. Paiva, 892 F.2d 148, 156-
57 (1st Cir. 1989). Devlin was "competent," to use the district
court's term, to testify concerning the success and growth of Can
Share during the period in which he and Lynch worked together based
upon his personal observation of Lynch's work. We also conclude
that Devlin's opinion concerning the growth and success of Can
Share would have been "rationally" based upon his perception of
Lynch's work, in the sense that no irrational leaps of logic would
have been required in order for Devlin to render the rather
straightforward opinion Lynch sought to elicit.
 Even though rationally based on the witness's personal
perception, lay opinion testimony will be excluded if it is not
"helpful" to the trier of fact. See Fed. R. Evid. 701. Lay
opinions are not helpful when the jury can readily draw the
necessary inferences and conclusions without the aid of the
opinion. See 7 J. Wigmore, Wigmore on Evidence 1917-18 (lay
opinions are superfluous when the jury, unaided by opinion, can
draw the necessary inferences as effectively as the witness). 
Accordingly, the Rule vests considerable discretion in the trial
court in determining whether the jury will be aided by lay opinion
testimony. See 4 J. Weinstein, Weinstein's Federal Evidence 
701[05] (2d ed. 1998). 
 Here, as Lynch herself points out, Devlin testified at
some length concerning his personal observation of Lynch's
excellent organizational skills, her proficiency at long-term
program planning, her "phenomenal" ability to recruit participants
from the business community, her "incredible" motivational skills,
and her ability to communicate clearly. Devlin testified that
Lynch's ability to recruit in the business community "brought in a
lot of people to take part in the campaign fully." Contrary to
Lynch's assertion that the jury could not determine "how effective
plaintiff was in her job" without Devlin's lay opinion, the jury,
unaided by Devlin's opinion, could readily have drawn the inference
from Devlin's detailed factual account of Lynch's exceptional work
at Can Share that Lynch was quite effective in her position and was
responsible for the success and growth of the Can Share program
during the time she and Devlin worked together. Compare United
States v. Jackman, 48 F.3d 1, 5-6 (1st Cir. 1995) (witness's
testimony identifying defendant from surveillance photographs
admitted since jury not in as good position as witness to determine
identity). Hence the district court may well have believed in
finding the opinion not to pertain to an appropriate subject for
lay opinion testimony that it would simply not be helpful. In
any event, even assuming error in refusing to admit the opinion,
the error would be harmless given the considerable body of
testimony that was admitted pointing in the same direction.
 Finally, Lynch asserts that the district court erred in
excluding certain testimony by her expert witness, Ellen Bassuk,
M.D. Under the Massachusetts Whistleblower Statute, Lynch had to
demonstrate that she had an objectively reasonable basis for her
belief that the perceived staffing shortage at the ESC on January
12, 1994 created a risk to the public health and safety. See Mass.
G. L. ch. 149, 185. Dr. Bassuk testified that the circumstances
that existed on January 12, 1994, including the extreme cold and
the absence of the ESC staff, created a public health risk that
would be potentially life-threatening. Nevertheless, the jury
found that Lynch did not have a reasonable belief that the public
health or safety was in jeopardy when she made the telephone call. 
See Lynch, 989 F. Supp. at 302-03. 
 Lynch asserts that the district court erred in excluding
testimony by Dr. Bassuk concerning the efficacy of the beeper
system used by Cronin and other ESC employees and the availability
of brochures that contained information concerning shelters and
other services for the homeless. Lynch contends that she offered
this testimony to rebut testimony by Cronin to the effect that the
homeless were not in danger on January 12, 1994 because the City
had a beeper system and brochures were available at the ESC that
listed various services for the homeless. The district court
excluded Dr. Bassuk's testimony because it was concerned that to
allow the parties to litigate the efficacy of the City's beeper
system and the content of its written brochures would inject an
irrelevant issue into the case whether the City should have done
more to protect the homeless and would potentially cause a
significant increase in the length of the trial. 
 The district court may have gone too far in asserting 
that Lynch sought to inject an irrelevant issue into the case. 
Lynch was seeking to counter Cronin's defense, presaged during her
testimony, that the availability of the beeper system and the
brochures rendered unreasonable Lynch's belief that the public
safety was endangered by the lack of staffing at the ESC. But
courts have latitude to keep trials on track and to limit the
exploration of secondary issues. As the Supreme Court has stated:
 Within limits, the judge may control the scope
 of rebuttal testimony, may refuse to allow
 cumulative, repetitive, or irrelevant
 testimony, and may control the scope of
 examination of witnesses. If truth and
 fairness are not to be sacrificed, the judge
 must exert substantial control over the
 proceedings.

Geders v. United States, 425 U.S. 80, 86-87 (1976). The district
court acted within the appropriate limits here.
 The district court here did not entirely preclude Dr.
Bassuk from rendering her opinion. Dr. Bassuk testified:
 Q: Let us assume that the director of the
 city agency in question, regardless of its
 name, had a beeper or a pager with her while
 she was out of the agency office on the day in
 question. would that affect the opinion that
 you just rendered?

 A: No, I don't think so. It would naturally
 depend on the nature of the beeper system, on
 such things as whether there were protocols
 that insisted that if you had a beeper, you
 were called, that you were supposed to respond
 in a timely way, that there was some kind of
 system set up for immediate and rapid
 response.

At this point, the district court interrupted and, for the reasons
stated, struck that portion of Dr. Bassuk's testimony that came
after her answer "No, I don't think so." However, Dr. Bassuk had
already opined that the circumstances as described on January 12,
1994 created a potentially life-threatening risk, and she was
permitted to further state that her opinion would not be affected
by the assumption that a beeper system was available to Cronin and
members of her staff. The court only interrupted when it appeared
that the testimony and further questioning might lead to a mini-
trial on the issue of the City's beeper protocol. We find no abuse
of discretion.
 We reach a similar conclusion with regard to the district
court's partial exclusion of Dr. Bassuk's testimony concerning the
availability at the ESC of brochures that listed various services
for the homeless, including soup kitchens and shelters. The
district court, again out of a concern that Lynch was attacking the
efficacy of the City's services generally, limited Dr. Bassuk to
opining only as to whether the listing of any private services in
the brochures would alter her opinion concerning the risk to public
health. Dr. Bassuk was permitted to respond that the availability
of such information would not change her opinion that the public
health was in jeopardy on January 12, 1994. The district court did
not abuse its discretion in limiting the scope of Dr. Bassuk's
testimony concerning brochures. Further, even if the court erred
in proceeding in this fashion, the remainder of Dr. Bassuk's
testimony rendered any such error harmless. Dr. Bassuk went on to
testify at some length that referral brochures were generally a
poor resource for the homeless for several reasons. She pointed to
studies that had demonstrated that many homeless persons are
illiterate, fail to follow through with referrals, and have
difficulty obtaining transportation to the services available. 
Thus, Dr. Bassuk was effectively permitted to opine that the
listing of any services, whether public or private, would have been
an ineffective means of mitigating the risk to the health and
safety of the homeless population caused by the under-staffing at
the ESC. 
 In sum, we conclude that the district court acted within
its discretion when it refused to honor the parties' purported
procedural stipulation. We reach the same conclusion with regard
to the district court's exclusion of Devlin's lay opinion and its
partial exclusion of Dr. Bassuk's testimony. Lynch was not
deprived of a fair trial on her state law whistleblower claim. 
E. Reputational Damages
 The jury awarded Lynch $12,000 for loss of reputation in
connection with her removal from the Hunger Commission. The
district court eliminated this award when it granted judgment as a
matter of law in favor of Cronin on the ground of qualified
immunity. We upheld this ruling, supra. Lynch asserts on appeal,
however, that even if her section 1983 claim is not reinstated, she
is entitled to the $12,000 in reputational damages under her state
law tort claim for intentional interference with advantageous
relations. We disagree.
 In order to prevail on a claim of intentional
interference with advantageous business relations, a plaintiff must
demonstrate actual harm to an existing or prospective relationship
of economic benefit. See Ratner v. Noble, 35 Mass. App. Ct. 137,
138 (1993). Lynch has not met that burden here. Her removal from
the Hunger Commission, an honorary position, resulted in no
pecuniary loss, or at least none reflected in the record. Thus,
Lynch is not entitled to the jury's award of $12,000 in
reputational damages, either under her First Amendment claim or
under her intentional tort claim. 
F. Phase II -- Punitive Damages 
 Lynch asserts that the trial court committed several
errors during Phase II of the trial, which was devoted solely to
the issue of whether punitive damages should be awarded. The jury
awarded $10,000 punitive damages in connection with its findings
that Cronin had violated Lynch's First Amendment rights. However,
we have concluded that the failure to re-hire Lynch for the 1994
Can Share program did not constitute a First Amendment violation. 
Thus, there is no basis for an award of punitive damages and we
need not consider Lynch's claims of error with regard to Phase II
of the trial.
G. Cronin's Cross-Appeal
 Cronin raises a single issue in her cross-appeal: 
whether Lynch was entitled to the district court's award of $4,000
in emotional distress damages based upon her state law claim for
intentional interference with advantageous relations. Cronin
asserts that the award of emotional distress damages was improper
because Lynch failed to demonstrate, as required under
Massachusetts law, that she suffered any pecuniary harm from
Cronin's interference with her advantageous relations with the
City.
 The jury awarded Lynch $4,000 for emotional distress
caused by Cronin's statement on January 13, 1994 that she must
"clear out her desk." In its original judgment, the district court
allocated the $4,000 in emotional distress damages to Lynch's First
Amendment claim. After it dismissed Lynch's First Amendment claim,
the district court in the amended judgment allocated the jury's
$4,000 emotional distress award to Lynch's intentional tort claim. 
Cronin asserts that this allocation was error. We agree. 
 To prove her claim of intentional interference with
advantageous relations, Lynch had to demonstrate that (1) a
business relationship existed; (2) Cronin knew of such
relationship; (3) Cronin intentionally and improperly interfered
with that relationship; and (4) Lynch suffered a loss as a result
of that interference. See United Truck Leasing Corp. v. Geltman,
406 Mass. 811, 814-16 (1990).
 The district court found that Cronin's interference with
Lynch's prospective relationship with the City occurred on January
13, 1994 when she told Lynch to "clear out her desk." See Lynch,
989 F. Supp. at 298 ("An interference occurred on the day that the
defendant ordered the plaintiff to clear out her desk."). But as
we have stated, supra, the record demonstrates that Cronin's
statement did not constitute a communicated decision at that time
not to re-hire Lynch for the 1994 Can Share drive. An adverse
employment action was made and communicated to Lynch several months
later, in June, 1994. By that time, Cronin had reorganized the ESC
and hired Markland for the Staff Assistant II position. The jury
found that the hiring of Markland in connection with the
reorganization of the ESC was not retaliatory and that Lynch was,
in any event, not qualified for the Staff Assistant II position. 
As Cronin did not then intentionally and improperly interfere with
Lynch's relationship with the City, there is no liability under
Lynch's intentional tort claim. 
 Massachusetts case law is clear, moreover, that a
plaintiff cannot recover emotional distress damages in connection
with a claim for intentional interference with a prospective
business relationship unless she can first demonstrate actual
economic damages. See Ratner v. Noble, 35 Mass. App. Ct. 137, 138
(1993). The only actual damages Lynch claims to have suffered
arose from her failure to be hired as the 1994 Can Share
coordinator. But, as said, the decision not to hire Lynch in June,
1994 was reached for legitimate reasons, namely because Lynch was
not qualified for the job. As Lynch has failed to demonstrate that
she suffered any actual damages as a result of Cronin's statement
on January 13, 1994 that she must "clear out her desk," the award
of emotional distress damages was improper.
 III. Conclusion
 We reverse and vacate the district court's award of
$4,000 in emotional distress damages in connection with Lynch's
intentional tort claim. Otherwise, we affirm the judgment of the
district court in all respects. The parties shall bear their own
costs on appeal.