Evelyn GONZÁLEZ–PÉREZ,
et al., Plaintiffs,

v.

Rafael GÓMEZ–ÁGUILA,
et al., Defendants.

Civil No. 00–2602(HL)(JA).

United States District Court,
D. Puerto Rico.

Dec. 8, 2003.

Judith Berkan, Mary Jo Méndez–Vilella, G–11 O'Neill, Peter Berkowitz, San Juan, PR, for Plaintiff or Petitioner.

Ricardo L. Rodríguez–Padilla, Andrés W. López, San Juan, PR, Eileen Landrón–Guardiola, Edardo A. Vera–Ramírez, Centro Internacional de Mercadeo, Guaynabo, PR, Nelson Robles–Díaz, Federico Lora–Lopez, Nancy Santiago–Otero, Legal Services—P.R. Police Dept., San Juan, PR, for Defendant or Respondent.

## OPINION AND ORDER

ARENAS, United States Magistrate Judge.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This is an action for damages brought pursuant to 42 U.S.C. §§ 1983, 1988, for the wrongful death of Anthony Hernández–González (hereinafter "Anthony"), a 17–year–old resident of the Monte Park Residential Housing Project (hereinafter "Monte Park"). Plaintiffs are the family members and heirs of Anthony, who was shot and killed during the morning hours of New Years Day, 2000, at Monte Park. The defendants are the police officers, members of the Police Department San Juan Saturation Unit, who allegedly shot and killed Anthony, and the supervisors of said officers.

Plaintiffs allege that shortly after midnight on New Years Eve, 1999, defendant police officers entered the premises of the Monte Park and shot indiscriminately at the buildings where residents of all ages celebrated the Millennium. In doing so, they injured Anthony and another youngster, both of whom took refuge in the center of a stairwell of one of the buildings. It is further alleged that acting in concert, some of the police officers entered the stairwell and that one of them administered the gun shot that ultimately killed Anthony. Finally, it is plaintiffs' general contention that the defendants orchestrated a massive cover-up of the incidents that transpired that night, including but not limited to the planting of an AK–47 rifle next to the body of Anthony. The plaintiffs also allege supervisory liability for the involvement of supervisors in said cover-up as well as for certain failures in the monitoring, evaluation and discipline of the police officers under their charge. The excessive force used by the police officers violated Anthony's constitutional rights according to the plaintiffs.

The defendants on the other hand contend that the officers acted reasonably in the use of deadly force and in responding to a real threat. They claim that residents of Monte Park, including Anthony, were shooting at them on the night in question. The planting of a weapon near Anthony's body is denied by the defendants.

This case was called for trial on November 20, 2003. (*See* Docket No. 241.) Prior to the commencement of trial, the defendants objected to the plaintiffs' request for a site inspection.[1] In their motion titled "Defendants' Motion Informing Their Position on Plaintiffs' Request for a Site Inspection" filed on November 17, 2003 (Docket No. 233), the defendants launched a number of objections to plaintiffs' request for a jury view of the scene. In the alternative, the defendants requested that if the view was to be allowed, that it be conducted at nighttime to more closely resemble the conditions in which the incidents occurred. (*Id.*) Plaintiffs filed their opposition to defendants' motion on November 18, 2003. (Docket No. 238.) I denied defendants' motion on November 20, 2003. (Docket No. 236.)

The jury view was scheduled for November 26, 2003. (Docket No. 249.) The view was conducted on the afternoon of November 26, 2003. (Docket No. 249.) The jury, the staff and myself were transported by United States Marshal personnel to the premises of Monte Park. At about 2:30 p.m. we arrived to Monte Park and were met by both plaintiffs' and defendants' counsel. The first stop was made at the fence at the end of Cafeto Street, which includes a gate that gives access to Mrs. Noemi Rodríguez' property. It is alleged that co-defendants police officers entered Monte Park through the gate on Cafeto Street, through Mrs. Rodríguez' property and then through the gate that gives access to the rear parking lot of Building S–2. The stairwell of Building S–2, specifically the first landing in said stairwell, is where Anthony was shot and killed. The gates were never opened. After a brief inspection, the jury returned to the vehicles and were driven to what had been a pedestrian entrance which is now also a vehicle entrance to Monte Park. The jurors did not exit the vehicles but slowly drove by the site and were then driven to a parking area behind Building S–2 using Monte Park's main entrance. An entourage of Puerto Rico Police officers joined by the Puerto Rico Chief of Police were present at the rear parking lot. A number of residents of Monte Park were also present in the surroundings as well as abundant media personnel with cameras.

The jury, the staff and myself stepped out of the vehicles near the back fence at the rear of the parking area and walked toward the fence. Then, we all walked directly and smartly to the back of Building S–2. The jury agreed to enter the stairwell by crouching under the first landing and passed through single file. The jury was instructed to go up the steps as far as the second landing and back down. We all walked around Building S, past a gaggle of onlookers, and returned directly to the waiting vehicles and left Monte Park.

Later, the defendants moved for mistrial in court, outside the presence of the jury, arguing *inter alia* that the view was unduly prejudicial. They claim a prejudice so great as to require a new trial. I denied their motion with a ruling from the bench. (*See* Docket No. 250.) I explain.

## II. THE NATURE OF JURY VIEWS

"[A] federal court, exercising its inherent powers, may allow a jury in either a civil or a criminal case to view places or objects outside the courtroom." *Clemente v. Carnicon–Puerto Rico Management Assocs.*, 52 F.3d 383, 385 (1st Cir.1995); *see also United States v. Passos–Paternina*, 918 F.2d 979, 986 (1st Cir. 1990). The leading cases in this circuit regarding jury views are *United States v.*

---

1. For correctness sake I will refer to the inspection by the jury as "view" or "jury view" which is the term uniformly used by the courts.

*Gray*, 199 F.3d 547 (1st Cir.1999) and *Clemente v. Carnicon–Puerto Rico Management Assocs.*, 52 F.3d at 383. In *Gray*, the First Circuit overruled that portion of *Clemente* which held that a jury view does not constitute or generate evidence. *United States v. Gray*, 199 F.3d at 548. The court observed that, although the opinion expressed in *Clemente* is still the majority position, it found no reason to disagree with the commentators that had questioned the rationale for excluding views from evidentiary status. *United States v. Gray*, 199 F.3d at 548–49. The court explained that the momentum appears to be headed in an opposite direction. *Id.* at 548. It agreed that a distinction between non-evidence that aids the jury's understanding, and traditional, independent evidence is lost on a jury. *Id.* at 549. It is unlikely, in the court's opinion, "that jurors, confronted with testimonial evidence at odds with what they have seen, 'will apply the metaphysical distinction suggested and ignore the evidence of their own senses.'" *Id.* at 549 (quoting 2 John W. Strong et al., *McCormick on Evidence* § 216, at 29 (5th ed.1999)). Accordingly, "the information obtained through a view may constitute independent evidence at trial...." *United States v. Gray*, 199 F.3d at 550.

■ Despite this change on the law, *Clemente's* holding remained in effect insofar as the "trial court's inherent power to decide whether to allow a jury view at all" was not diminished. *United States v. Gray*, 199 F.3d at 550. "Determining if a view is appropriate in a particular situation remains a matter committed to the trial court's informed discretion." *United States v. Gray*, 199 F.3d at 550 (citing *Clemente v. Carnicon–Puerto Rico Man-*

*agement Assocs.*, 52 F.3d at 386). The court further observed:

> Moreover, the fact that we now regard a view to be within the category of admissible evidence not only endows a trial court with the same discretion to control its admission that the court has in dealing with all evidentiary matters, but also may in the future require special techniques and practices as experience indicates. This opinion does not purport to resolve all issues that may arise stemming from the status of a view as evidence; it simply removes the concept of a view from the highly ambiguous state of being something to consider but not evidence. Our holding thus increases the range of admissible evidence but leaves intact the district court's authority to refuse a view in particular cases, or to exclude a view, or portions of it, from evidence when an on-the-scene observation does not transpire as the court had anticipated.

*United States v. Gray*, 199 F.3d at 550.

In addition, it has been held that since jury supervision is more difficult outside the courtroom, precautions must be taken to minimize problems. *Id.* In *Clemente*, the court enumerated a series of fundamental safeguards that the trial judge must undertake.[2] *Clemente v. Carnicon–Puerto Rico Management Assocs.*, 52 F.3d at 386. The court explained that "these safeguards are aimed at achieving fairness and maximizing the trial's truth-seeking function." *Clemente v. Carnicon–Puerto Rico Management Assocs.*, 52 F.3d at 386. The court outlined a five-step protocol to be followed by the trial court. *Id.*

■ "First, counsel should be alerted to a proposed view at the earliest practicable

---

**2.** The court in *Gray* approved of the safeguards outlined in *Clemente*. *United States v. Gray*, 199 F.3d at 550. So, notwithstanding the overruling of *Clemente* on other grounds, at least four of the five safeguards listed therein should be applied to jury views in general.

time and given an opportunity to be heard." *Id.* The second step was essentially eliminated by the holding in *Gray* insofar as it required that the jury be instructed prior to the view that the view itself is not evidence. *See United States v. Gray,* 199 F.3d at 550 (regarding views to be within the category of admissible evidence). Third, the trial judge must allow counsel to attend the view even though he or she may place limits on their interactions with the subject of the view and the jurors. *Clemente v. Carnicon–Puerto Rico Management Assocs.,* 52 F.3d at 386. Fourth, the trial judge must him or herself attend the view since his or her oversight is as important during the view as in the course of the trial. *Id.* Finally, the court must make sure that what transpires at the view is fully and accurately recorded, usually by enlisting the attendance of a court reporter. *Id.* This list is not exhaustive or inflexible. The special circumstances of a given case may require additional and different prophylactic measures, while departing from the list may also be warranted. *Id.*

 Finally, the court in *Clemente* noted that the implementation of the above-mentioned safeguards do not rest exclusively upon the trial judge. *Id.* If a view is ordered but the trial judge "strays from the prophylaxis that should accompany it, an offended party must bring the omissions to the judge's attention in a timeous fashion, and, if necessary, lodge a formal objection." *Clemente v. Carnicon–Puerto Rico Management Assocs.,* 52 F.3d at 386–87.

### III. THE VIEW IN THIS CASE

The view in this case was conducted in accordance with the principles stated above. Prior to the view, the jury was instructed in general about the procedures to be followed during the view. Among other things, the jurors were reminded of the prohibition against discussing the case between each other and informing me of any irregularity during the view. Specifically, the jury was instructed that what they were about to see was evidence which was meant to help them in determining factual issues.

The defendants were put on notice since July, 2003 that plaintiffs would be requesting a view.

As to the third and fourth steps of *Clemente,* they are also clearly satisfied here. Counsel attended the view and were present at all times during the same. No interaction between the jurors and counsel was allowed and I was present at the view to supervise the proceedings as required by *Clemente.* Finally, the events that transpired on the view were recorded by the court recorder as reported by me.

### IV. DEFENDANTS' MOTION FOR MISTRIAL

 On December 1, 2003, the court heard argument from the parties regarding defendants' motion for a mistrial. The defendants contended that the court should declare a mistrial because the view was unduly prejudicial. They particularly argue that the events underlying this suit occurred at nighttime and that a view in daylight conveyed to the jury a skewed image of the scene that the police officers confronted that evening. The defendants also take exception with the distances and the line of sight presented to the jury. They claim that the jurors should have walked through the fences used by the police officers to enter Monte Park. According to the defendants, what prevailed at the view was a Disney World atmosphere; a picnic designed to present and argue plaintiffs' case as if it was time for closing arguments and to influence the jury in believing that no violent act could occur in a place where children were playing with their families. Finally, the defen-

dants assert that they were unduly prejudiced by the presence of a headstone which worked as an argument as to the goodness of the deceased.

The plaintiffs argued to the contrary, that the purpose of the view was to put in context the spatial relations at Monte Park, specifically where the incident occurred. The plaintiffs further argued that the view was necessary because photographs do not convey such spatial relationships. In addition, the plaintiffs claim that in terms of time sequences and darkness, there has been and there will be testimony describing the scene on the night in question and there is a video that shows how Monte Park looked that night. Finally, as to the headstone, the plaintiffs argue that it has been there since Anthony's death and that the defendants knew or should have known that it was there based on their own investigations.

The defendants fail to make a showing of prejudice with respect to the jury view conducted. Moreover, defendants' main contention is that the view should have been conducted at nighttime so as to more closely resemble the conditions confronted by the officers on the morning hours of January 1, 2000. The main idea of the view was to give the jurors a better perception of the physical layout of the entire area in which the events took place. For that, the view in daylight can hardly be said to cause undue prejudice.

The jury was specifically instructed that what they saw at the view constitutes evidence and that it was not intended to recreate exactly what happened. To the contrary, they were instructed that the purpose of the view was to help them in determining facts at issue. The jury was told that although there was a gallery of people watching like it was some sort of entertainment, that it was not a family day. Finally, it should be noted that defendants' contention that the view presented a softer image of Monte Park is refuted by the fact that there was substantial security at the view including the presence of the Chief of Police and a great number of officers none of whom played any role in the jury view, except to be present in the general area of the rear parking lot. In addition, the defendants are not precluded from making references to violent incidents at Monte Park.[3]

Because the defendants failed to make a clear showing of undue or unfair prejudice with respect to the view conducted, the motion for a mistrial is DENIED.

SO ORDERED.

---

**3.** *See* Docket No. 230, ruling that the defendants are allowed to make reference to Monte Park as a violent place prior to January 1, 2000.